**BIRCH RUN WELDING & FABRICATING, INC.,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 84–5335, 84–5470.

United States Court of Appeals,
Sixth Circuit.

Submitted March 14, 1985.

Decided May 13, 1985.

John W. Wolf, Thomas A. Basil, Luce, Basil & Collins, Saginaw, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for respondent.

Before KENNEDY and CONTIE, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

Birch Run Welding & Fabricating, Inc. (Birch Run) petitions for review of, and the National Labor Relations Board (Board) cross-applies for enforcement of, a Board order concluding that Birch Run violated § 8(a)(3) of the National Labor Relations Act (Act) by laying-off thirteen employees after becoming aware of an organizational campaign by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Union). For the reasons stated below, we enforce the Board's order.[1]

1. The Board also determined that Birch Run had not violated § 8(a)(1) of the Act, that Daniel Oberg was a protected employee under the Act and that Frederick May, Jr., plant manager of Saginaw Engineering and Control Company, was not an agent of Birch Run. These findings are not at issue on this appeal.

## I.

As of January 1983, Birch Run employed thirty-five to forty employees at its plant located in Birch Run, Michigan. The company President was Harold Johnson. Birch Run's plant was divided into front and back shops. The front shop contained tool rack fabrication and repair operations. The back shop housed a machine shop and an assembly floor where die cast machines were built and used die cast machines were rebuilt. Employees Kamrade, Oberg,[2] Parlberg, Schmidt and Wade worked days in the front shop along with several other unidentified employees. Their supervisor was George Anscomb. Employees Altman, Aquirre, Benham, Berg, Sparck and Yaklin worked nights in the front shop. The record does not identify their supervisor. Employees Clark and Humes worked days in the back shop machine shop under supervisor Gerald Johnson. Employees Kuhr, Morris, Reikowski, VanNess and Zabarcki worked days in the back shop assembly floor under supervisor Thomas Goodreau. Employees Hogan, Metiva and Reittenbach worked nights in the back shop machine shop under supervisor Ted Dahl. The record is unclear about who worked nights in the back shop assembly floor. Employees Barske and Lonsway (and possibly others) may have worked in this area.

Birch Run frequently laid off employees. Employees Aquirre, Oberg, Parlberg, Schmidt and Zabarcki, for instance, had all been temporarily laid off in the past. The company had no formal lay-off policy and did not use the seniority system. If an employee were working on an order at the time of a lay-off, he would finish before being laid-off even if a more senior employee were available. Nor were recalls based upon seniority. The company usually did lay-off the night shift before the day shift, however.

Humes, a lathe operator, contacted union representative Koster late in 1982. Ten employees, including Humes, attended an organizational meeting at a union office in Saginaw on January 16, 1983. Some employees signed union authorization cards. Eighteen to twenty employees attended a second meeting at a union office located outside Saginaw on January 23. More employees signed authorization cards and the group formed an organizing committee consisting of employees Altman, Aquirre, Barske, Hogan, Humes, Lonsway, Metiva, Oberg, Parlberg, Reittenbach, Sparck and Zabarcki. The union sent a letter containing these names to the purported Chairman of the Board of Birch Run. The postal service returned this letter unopened, however, and there is no evidence that Birch Run ever learned of its contents.

At this time, Birch Run was experiencing economic difficulties. An unspecified number of employees had already been laid-off and others had been assigned to jobs outside of their normal classifications. Work existed, however, for the employees who remained on January 25 and 26, the dates upon which the relevant events occurred.

Company President Johnson met with all night shift employees on January 25 and with all day shift employees at 7:00 A.M. on January 26. Johnson stated that business was not good because many of Birch Run's competitors were going bankrupt, thereby flooding the market with die cast machines. Moreover, many company customers were going bankrupt and were not paying their bills. Thus, the company was accepting low profit or no profit tool rack work merely to maintain a "core" of good workers. Although supervisor Anscomb would begin traveling in an attempt to attract new business, the prospects were not good. Johnson also stated that a local bank wanted the company to lay-off thirty percent of its remaining workers but that the company wanted to avoid further lay-offs. Johnson indicated that Birch Run was "holding water" and would not "fold." No pay raises or paid vacations would be forthcoming in the foreseeable future, however. Employee Zabarcki testified at the hearing before the Administrative Law Judge (ALJ) that a similar speech had been

---

**2.** The record indicates that Oberg sometimes worked nights.

given one month before a large lay-off early in 1982 (Tr. at 323).

Humes returned to his work station after the meeting. Harold Johnson approached and offered Humes a pay raise because of his good work performance provided that he did not tell other employees. Humes accepted. Supervisor Gerald Johnson subsequently approached Humes and stated that he would have difficulty explaining the lack of pay raises when there was sufficient work in the plant to keep the remaining employees busy. Both men then went to Harold Johnson's office. As the latter was explaining recent losses, Humes interrupted and stated:

> I think it's about time we stopped beating around the bush.... I think you guys know there's an organizing drive going on in the shop right now and I don't know why you have me up here showing me this stuff, but I I think it's for this reason, and if you don't know it, you do now. (Tr. at 39).

The Johnsons denied prior knowledge of the union campaign and asked what the employees wanted. Humes responded that the employees wanted many different things, including job security, and that they had not believed a word that Harold Johnson had said at the meeting.

At lunch hour on January 26, Humes gave union buttons, pens and pocket protectors bearing union insignia to Schmidt and Zabarcki. Schmidt placed a pocket protector in his shirt pocket where it remained for the rest of the day. Zabarcki wore a union button on his shirt for the remainder of the day.

At 3:00 P.M., supervisor Anscomb approached Schmidt with a blueprint. As the men leaned over the blueprint, Anscomb gave Schmidt a job assignment that would require several hours to complete. The men then straightened. Anscomb saw the union pocket protector, stated that he would return momentarily and walked away. When Anscomb returned ten or fifteen minutes later, he laid-off Schmidt effective at the 3:30 P.M. shift ending time

despite the fact that he had just given Schmidt the new assignment.

Supervisor Goodreau laid-off Humes, Clark and Zabarcki. These lay-offs also were effective at 3:30 P.M. Schmidt and these three employees subsequently received letters suggesting that they seek employment elsewhere because there was no reason to believe that they would be recalled. Although Clark, Schmidt and Zabarcki had been laid-off before, they had never received such letters. Birch Run also laid-off Parlberg and VanNess on the afternoon of January 26. VanNess was not a union adherent. Employee Morris, who was a union supporter, was not laid-off.

Before leaving the plant at 3:30 P.M., Humes gave the union campaign materials to Hogan, the night shift lathe operator. At lunch time, Hogan distributed union materials to Aquirre, Oberg, Sparck and Yaklin. Aquirre and Oberg attached buttons to their coats and hung them near their work stations. Yaklin wore a union button on his hat for the rest of the evening.

Although supervisor Anscomb usually did not arrive at the plant until 5:00 A.M., he appeared at 11:00 P.M. on January 26 and laid-off Altman, Aquirre, Benham, Oberg, Reittenbach, Sparck and Yaklin. All but Benham were union adherents. Oberg asked if the company was not making enough money or did not have sufficient work. Anscomb responded that the company was making money and had plenty of work. When Oberg then inquired about the reason for the layoffs, Anscomb stated, "it's all part of the game."

Union supporters Hogan and Metiva were not laid-off on January 26. Even though Hogan could produce only one-third as much as Humes on the lathe, he replaced Humes on the day shift lathe operation. The record further reflects that when the thirteen employees were laid-off on January 26, they left behind uncompleted assignments.

After the lay-offs, Hogan taught supervisor Dahl to use the lathe and taught supervisor Gerald Johnson to operate the boring

mill. Although the plant had operated on a five-day work week before January 26, the plant frequently operated six days per week thereafter. Moreover, within three months after the lay-offs, Birch Run hired two new assemblers and six new machine shop workers. Although Altman, Aquirre, Benham and VanNess eventually were recalled, none of the other laid-off employees has been recalled.

Since Birch Run contended at the administrative hearing, in response to the General Counsel's charges, that the lay-offs were economically motivated, the ALJ evaluated the case under the standards set forth in *Wright Line,* 251 N.L.R.B. 1083 (1980). The ALJ held that the General Counsel had shown that anti-union animus had contributed to Birch Run's decision to lay-off the thirteen employees. Furthermore, the company had not rebutted this prima facie case. The ALJ concluded, therefore, that Birch Run had violated § 8(a)(3). The ALJ ordered Birch Run to cease and desist from violating § 8(a)(3), to reinstate the laid-off employees with back pay, to expunge any reference to the lay-offs from the employees' personnel records and to post notices. The Board subsequently adopted the ALJ's order. 269 N.L.R.B. No. 136. Birch Run then filed this petition for review and the Board cross-applied for enforcement.

## II.

In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved the *Wright Line* method of analyzing cases involving charges of employment actions motivated by anti-union animus and employer protestations of legitimate reasons for the actions. In a case involving lay-offs, the General Counsel must prove that anti-union animus partially motivated or contributed to the lay-off decision. If this prima facie case is established, then the employer must show by a preponderance of the evidence that the employees would have been laid-off even if they had not engaged in protected activity. *Id.* at 395, 103 S.Ct. at 2471; *N.L.R.B. v. A*

*& T Manufacturing Co.,* 738 F.2d 148, 149 (6th Cir.1984); *N.L.R.B. v. Valley Plaza, Inc.,* 715 F.2d 237, 241 (6th Cir.1983). Since employer motivation is a factual question, *A & T Mfg.,* 738 F.2d at 149 (cases collected), the Board's conclusion concerning motivation must be upheld if supported by substantial evidence on the record considered as a whole. *Id.;* 29 U.S.C. § 160(e). Contrary to Birch Run's assertion, improper employer motivation need not be demonstrated by direct evidence but may be inferred from all the circumstances. *See N.L.R.B. v. G & S Metal Products Co., Inc.* 489 F.2d 441, 443 (6th Cir.1973); *N.L.R.B. v. Buckhorn Hazard Coal Corp.,* 472 F.2d 53, 55 (6th Cir. 1973); *N.L.R.B. v. Lawson Printers, Inc.,* 408 F.2d 1004, 1005 (6th Cir.1969). The Board's inference of improper motivation must be upheld if it is reasonable in light of the proven facts. *See Radio Officers' Union v. N.L.R.B.,* 347 U.S. 17, 49, 74 S.Ct. 323, 340, 98 L.Ed. 455 (1954); *N.L.R.B. v. Paschall Truck Lines, Inc.,* 469 F.2d 74, 76 (6th Cir.1972).

In the typical § 8(a)(3) case, the General Counsel must demonstrate that the employer was aware of the pro-union sentiments of individual employees. *See M.S.P. Industries, Inc. v. N.L.R.B.,* 568 F.2d 166, 176 (10th Cir.1977); *Majestic Molded Products, Inc. v. N.L.R.B.,* 330 F.2d 603, 606 (2d Cir.1964). The evidence in the present case shows that Birch Run knew of Humes' and Schmidt's pro-union sentiments before the lay-offs. Humes told company President Johnson his feelings and supervisor Anscomb saw Schmidt's union pocket protector. In addition, Birch Run may have known of the sympathies of Aquirre, Oberg, Yaklin and Zabarcki because they displayed union materials either on their persons or near their work stations on January 26, 1983. There is no evidence in the record, however, to support the conclusion that Birch Run knew before the lay-offs that alleged discriminatees Altman, Benham, Clark, Parlberg, Reittenbach, Sparck and VanNess were union adherents. Indeed, such proof would have been impossi-

ble as to Benham and VanNess because those two employees were against the union. Consequently, had the General Counsel proceeded in this case under the usual § 8(a)(3) theory, substantial evidence would not have supported the Board's conclusion regarding at least seven of the employees. The Board's conclusion as to Aquirre, Oberg, Yaklin and Zabarcki also may have been problematic.

■ As indicated in the ALJ's opinion, however, the General Counsel proceeded under an alternate theory. Specifically, the courts have held that although the General Counsel must usually show that the employer knew about individual employees' union activities before the Board may conclude that the employer violated § 8(a)(3), the General Counsel may also prevail by showing that the employer ordered general lay-offs for the purpose of discouraging union activity or in retaliation against its employees because of the union activities of some. This theory is viable even though some employees who actually opposed the union (*i.e.*, Benham and VanNess) were laid-off with their pro-union counterparts. *See Merchants Truck Line, Inc. v. N.L.R.B.*, 577 F.2d 1011, 1016 (5th Cir.1978); *M.S.P. Industries*, 568 F.2d at 176; *Majestic Molded*, 330 F.2d at 606. Moreover, the theory can be valid even though not all union adherents were laid-off (*i.e.*, Hogan, Metiva and Morris). The focus of the theory is upon the employer's motive in ordering extensive lay-offs rather than upon the anti-union or pro-union status of particular employees. The rationale underlying this theory is that general retaliation by an employer against the workforce can discourage the exercise of section 7 rights just as effectively as adverse action taken against only known union supporters.

■ We hold that the evidence in this case amply supports the Board's inference

that Birch Run retaliated in a general manner against its workforce because some employees had engaged in protected activities. First, the record reflects that as of 7:00 A.M. on January 26, 1983, Birch Run assured its employees that it wanted to avoid additional lay-offs in order to maintain a core of competent workers even if low profit or no profit work had to be accepted. The record further shows that on the date of the lay-offs, sufficient work existed to occupy the remaining employees. Indeed, supervisor Anscomb told employee Oberg that the company was making money and that there was plenty of work. The only significant event occurring between the 7:00 A.M. meeting and the afternoon and evening lay-offs was that Humes informed company President Johnson that an organizational campaign had begun. Johnson reacted negatively to this information. There is absolutely no evidence that the company's financial position deteriorated during the day on January 26 such that immediate lay-offs were necessary.

Birch Run counters that although a meeting designed to assure employees that the company would try to avoid lay-offs occurred in early 1982, lay-offs nevertheless followed. This argument is flawed because a month passed between the meeting in early 1982 and the subsequent lay-offs. Birch Run's financial position may well have changed in the interim. In contrast, there is no evidence that an unfavorable change in financial position occurred on January 26, 1983.[3] Moreover, without regard to the absence of change in financial position, Birch Run's decision to lay-off thirteen employees within hours after becoming aware of the union organizational effort supports the Board's inference of improper motivation. *See Coil-A.C.C., Inc. v. N.L.R.B.*, 712 F.2d 1074, 1076 (6th Cir. 1933); *N.L.R.B. v. Stemun Manufactur-*

---

**3.** On this point, the ALJ commented:

Although past history discloses numerous lay-offs, and even discloses that Respondent similarly addressed its employees in early or spring 1982, as it later did on January 26, 1983, and yet laid-off employees in 1982, there is no past history disclosing such erratic behavior by Respondent where expectations of employment are given and shattered within a matter of a few hours.

ALJ opinion at 21.

*ing Co., Inc.,* 423 F.2d 737, 742 (6th Cir. 1970).

Second, Birch Run substantially deviated from past practice in implementing the lay-offs. This court has held that an employer's deviation from past practice can be an indicia of anti-union animus. *See N.L.R.B. v. Comgeneral Corp.,* 684 F.2d 367, 370 (6th Cir.1982) (deviation from past disciplinary practice during early stages of union campaign). The evidence shows that the laid-off employees had not completed assigned tasks. In contrast, the company's custom was to wait for an order or assignment to be completed before laying-off the employee who had performed the task. This deviation from past practice is most graphically illustrated by the company's treatment of Schmidt. Although supervisor Anscomb gave Schmidt an assignment requiring several hours to complete at 3:00 P.M., Anscomb laid-off Schmidt minutes later after spotting the latter's union pocket protector.

Birch Run also deviated from custom in transferring some night shift employees to the day shift instead of first laying-off the entire night shift. The decision to replace Humes with the far less efficient Hogan is particularly probative of the company's motives. After the 7:00 A.M. meeting on January 26, company President Johnson offered Humes a raise because of his good work performance. Yet, the company laid-off Humes hours later. The only significant intervening event was the discussion between Humes and the Johnsons in which Humes informed the Johnsons that an organizational campaign had commenced.

The company further deviated from past practice in sending letters to Clark, Humes, Schmidt and Zabarcki suggesting that they seek work elsewhere because there was no reason to believe that they would be recalled. Since three of these four employees were among the most prominent union adherents, the Board reasonably could view the letters as evidence of the company's anti-union animus.

Having concluded that the Board reasonably inferred that anti-union animus

contributed to Birch Run's decision, we also hold that the evidence supports the Board's determination that the employees would not have been laid-off had they not engaged in protected activities. Although the company contends that the lay-offs were motivated by economics, the record shows that there was sufficient work as of January 26 to keep the remaining employees busy. Moreover, the company expanded the work week and hired eight new employees shortly after the lay-offs. The company did not keep its promise, made at the 7:00 A.M. meeting on January 26 before becoming aware of the organizational campaign, that laid-off employees would be recalled before new employees would be hired.

The Board's determination that the lay-offs of the thirteen employees were unlawfully motivated is supported by substantial evidence. Accordingly, the order of the Board is ENFORCED.