**W.F. BOLIN COMPANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 93–5939.**

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1995.

Decided Nov. 17, 1995.

[redacted]

Christopher L. Lardiere (briefed), Thomas L. Magelaner (argued), Kemp, Schaeffer & Rowe, Columbus, OH, for petitioner W.F. Bolin Co.

David Seid (briefed), N.L.R.B., Office of General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Assoc. General Counsel, Paul J. Spielberg (briefed), Howard E. Perlstein (argued), N.L.R.B., Appellate Court Branch, Washington, DC, for respondent N.L.R.B.

Before: ENGEL, NELSON, and SUHRHEINRICH, Circuit Judges.

ENGEL, Circuit Judge.

W.F. Bolin Company ("WFB") seeks review of a decision of the National Labor Relations Board (the "Board") finding that it laid off James Wright and Neal Kehl for complaining about their wages and work conditions in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"). Because we find substantial record evidence in support of the Board's decision, WFB's petition is denied.

## BACKGROUND

### A. The Underlying Facts

In September 1991, WFB, a painting and wall covering contractor headquartered in Columbus, Ohio, began work as a subcontractor at the Logan Middle School in Logan, Ohio. Pursuant to a collective-bargaining agreement with Local 93 of the International Brotherhood of Painters and Allied Workers (the "Union") and two local contractor associations, WFB hired painters from the Union's hiring hall to perform work at the school.[1]

During the course of the project, disputes arose between WFB and its painters regarding WFB's compliance with the collective-bargaining agreement (the "CBA"). Led by James Wright and Neal Kehl, the painters complained that WFB was not fulfilling its part of the CBA with respect to travel pay,[2] extra pay for working with epoxy paint,[3] the timely distribution of paychecks at the work

---

1. WFB hired Job Steward Ed Minke and Larry Beasley on September 23, Dave Wachenschwanz on October 4, James Wright on October 10, Richard Spears on November 20, Howard Covey on November 25, Neal Kehl on December 12 and George Miller on December 30.

2. Under the CBA, when a work site is "[i]n excess of fifty (50) miles" from "the Washington County Court House," as is the Logan Middle School, the employer is required to pay one hour's pay to each employee for each day's work. WFB's part-owner and vice-president, William Bolin, raised the issue of travel pay with the Union's business agent, James Farley, before bidding on the Logan Middle School job. To encourage WFB to submit a competitive bid on the

project, Farley agreed that WFB would not have to pay travel pay for the job, although his authority to reach such an agreement is not clear.

3. The lavatories at the Logan Middle School were painted with epoxy, which gives off strong fumes and may be hazardous. Kehl, who did most of the epoxy work at the school, took the position that a 1991 amendment to the CBA, which is not part of the record, calls for additional pay for employees using epoxy in confined areas. Farley indicated agreement with Kehl's interpretation of the CBA, and told the employees that they would receive extra pay for epoxy work. However, when Bolin indicated that he did not consider the CBA to require extra pay for epoxy work, Farley did not press the matter.

# Untitled

site,[4] and the allocation of "premium pay" work.[5]

In November 1991, soon after work began at the school, Edward Minke, the job steward, raised the issue of travel pay with WFB's foreman at the site, Charles Tisher. In the presence of several other employees including Wright but not Kehl (who had not then been hired), Minke handed Tisher a copy of the CBA to show him that it provided for travel pay. Without examining it, Tisher threw the contract on the floor.

When William Bolin, WFB's part-owner and vice-president, learned of the complaint, he asked the Union's business agent, James Farley, to talk to the employees. Farley spoke to the painters on several occasions, explaining that the travel pay provision of the CBA did not apply to the job.

Farley's intervention notwithstanding, complaints continued. Wright complained to both Tisher and his coworkers. And when Kehl was hired on December 12, he voiced complaints as well. On his first day on the job, Kehl asked Tisher about the painters' not getting travel pay and showed Tisher a copy of the CBA provision requiring it. At different times during the first two weeks after he started, Kehl also complained to Tisher about not receiving extra pay for epoxy work, the allocation of premium pay work and the distribution of paychecks at the work site.

On December 24, with Tisher present, the employees met to discuss their complaints. Wright spoke for the painters regarding travel pay, and Kehl acted as a spokesman for the employees on issues such as travel, epoxy and premium pay.

Not long after the meeting, Tisher and James Ring, WFB's superintendent, walked past Kehl and Minke as the two employees worked with epoxy. Kehl asked Minke to ask Ring about epoxy pay, and Minke raised

the matter with Ring. Ring responded, "If you guys keep complaining I'm going to fire the whole crew and bring in a whole new crew."

As of January 10, 1992, the painting work at Logan Middle School was approximately seventy percent complete. However, substantial work, including primarily trim work, remained. Although it had hired George Miller approximately two weeks earlier, WFB determined that it needed only five painters (instead of seven) to complete the job and laid off Wright and Kehl.[6]

There is credible evidence that Wright and Kehl were at least as qualified as the other painters. However, Tisher claims that he selected Wright and Kehl for layoff because they were less qualified than the others to handle the remaining work. Tisher testified, "So I just chose the best ones to do the job and laid the other two off, or I kept the people I felt were the best qualified to finish the job is what it was."

## B. The Recommendation of the ALJ

Not long after being laid off, on March 13, 1992 and March 26, 1992, respectively, Wright and Kehl filed unfair labor practice charges against WFB. The General Counsel of the Board issued a consolidated complaint on April 16, claiming that WFB's agents made coercive statements to employees, violating § 8(a)(1) of the Act, and laid off Wright and Kehl for discriminatory reasons in violation of §§ 8(a)(1) and 8(a)(3) of the Act.

A hearing was held before an administrative law judge (the "ALJ") on August 18. The ALJ concluded that WFB violated § 8(a)(1) of the Act by reason of Ring's statement, but concluded that WFB did not lay off Wright and Kehl in violation of §§ 8(a)(1) and 8(a)(3). Although he found that Wright

---

4. According to the CBA, the employees are to receive their paychecks "on the job" no later than 4:30 p.m. on Friday.

5. The CBA provides that the painters are entitled to a higher wage for spray painting than for brush or roller painting and that "[a]ll premium pay shall be distributed equally among journeymen on the job."

6. Except for Beasley, who quit on November 19, the painters were laid off as follows: Wright and Kehl on January 10, Covey on February 10, Spears and Miller on February 27, Wachenschwanz on March 19 and Minke on April 3. (An electrostatic specialist named for Kimberling was hired for one day on April 3.)

and Kehl had engaged in protected activities within the meaning of the Act, the ALJ declined to find that WFB laid them off because of those activities.

According to the ALJ, neither Ring's statement nor Tisher's throwing down the CBA evidences animus towards Wright or Kehl. Ring's remark does not show animus toward them, the ALJ reasoned, because it was not directed at Wright or Kehl individually and was made without the intent of firing anyone. Tisher's throwing down the CBA does not demonstrate animus toward Wright and Kehl, because it falls short of proof that Tisher would be willing to fire an employee for engaging in protected activity and because it was directed at Minke, if at anyone.

The ALJ also declined to find that WFB showed animus toward Wright and Kehl on the basis of management's responses to the employees' complaints. He noted that Tisher "rarely seemed perturbed by" the employees' complaints and seems to have found Tisher reasonably responsive to the painters' complaints. As to the paycheck dispute in particular, the ALJ found it "hard to imagine why Kehl's complaints would have been unduly troubling to management."

Finding that the General Counsel had failed to show that no layoffs were warranted on January 10, that WFB ordinarily lays off painters according to seniority on the job, or that WFB supervisors were angered enough by Wright's and Kehl's protected activities to consider ending their employ, the ALJ placed the burden on the General Counsel to show that Tisher's stated reasons for laying off Wright and Kehl were false. The judge credited the testimony of the General Counsel's witnesses that Wright and Kehl were experienced painters who were "perfectly capable" of performing the trim work, but nevertheless held that such evidence falls short of proving that Tisher "could not reasonably have concluded that, relative to the other painters, Wright and Kehl were not as productive at the particular kinds of work that remained to be done as of January 10."

---

7. No exceptions were filed to the ALJ's conclusion that WFB violated § 8(a)(1) by reason of

## C. *The Decision of the Board*

The General Counsel filed exceptions to the recommended decision and order of the ALJ. According to the General Counsel, the ALJ erred in not finding that WFB laid off Wright and Kehl in violation of §§ 8(a)(1) and 8(a)(3).[7] Upon review, the Board essentially accepted the ALJ's findings of fact but disagreed with his conclusions, holding that WFB laid off Wright and Kehl in violation of §§ 8(a)(1) and 8(a)(3) of the Act.

The Board first held that the General Counsel established a prima facie case that a reason for WFB's selection of Wright and Kehl for layoff was their protected activity. Contrary to the ALJ, the Board found that Ring's unlawful remark about firing the crew evidences animus toward the protected activities of Wright and Kehl. According to the Board, "Ring's remark clearly expressed hostility toward and contemplated retaliation against employees who voiced further complaints," and "Kehl's and Wright's continued outspokenness on behalf of employees to complain about various working conditions" gives rise to an inference that WFB "was hostile toward Kehl and Wright regarding their continued voicing of complaints."

The Board also relied on Tisher's throwing down the CBA. Tisher's throwing down the CBA, the Board reasoned, "evidences hostility to the employees' protected activities in general and, by inference, to the protected activities of Kehl and Wright." The Board further relied on "the timing of the layoffs in close proximity to the employees' protected activities as evidence of animus toward the protected activities of Kehl and Wright."

Second, the Board held that WFB failed to rebut the General Counsel's prima facie showing that WFB laid off Wright and Kehl because of their protected activities. The Board concluded that WFB had not carried its burden because the only evidence of WFB's purported reason for laying off Wright and Kehl was "vague and conclusory testimony, unsupported by any specific or

Ring's statement.

objective evidence"; because the ALJ found that Wright and Kehl were both experienced painters capable of performing trim work and were "at least as good" as the other painters; and because Miller started work at the project less than two weeks before the layoff.

## DISCUSSION

Section 8(a)(1)of the National Labor Relations Act makes it an unfair labor practice for an employer to interfere with employees exercising the right guaranteed them by § 7 of the Act to act in concert for mutual aid and protection. 29 U.S.C. § 158(a)(1). Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against employees with regard to terms or tenure of employment for the purpose of discouraging membership in a labor organization. 29 U.S.C. § 158(a)(3).

■ Under these provisions, "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 397–98, 103 S.Ct. 2469, 2472–73, 76 L.Ed.2d 667 (1983); *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 528–29 (6th Cir.1984).

■ In *Transportation Management*, the Supreme Court "approved the *Wright Line* method of analyzing cases involving charges of employment actions motivated by antiunion animus and employer protestations of legitimate reasons for the actions." *Birch Run Welding & Fabricating Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985). Under the *Wright Line* method, the General Counsel must establish a prima facie case that anti-union animus motivated or contributed, at least in part, to a layoff decision. *Transportation Management*, 462 U.S. at 398–403, 103 S.Ct. at 2472–75 (approving *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir.1995). If this prima facie case is established, then the employer must demonstrate by a preponderance of the evidence that the employee would have been laid off even if s/he had not engaged in protected activity. *Transportation Management*, 462 U.S. at 398–403, 103 S.Ct. at 2472–75; *Cook Family Foods*, 47 F.3d at 816.

■ The standard of review when the Board finds a violation of §§ 8(a)(1) and 8(a)(3) is well established. The factual findings of the Board must be upheld if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e), (f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Where the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464–65; *NLRB v. A & T Mfg. Co.*, 738 F.2d 148 (6th Cir.1984).

■ Our deference to findings of fact runs in favor of the Board, not in favor of the ALJ. *Universal Camera*, 340 U.S. at 488–94, 71 S.Ct. at 464–68. However, the ALJ's findings are part of the record we must review. *Id.* In reviewing the substantiality of evidence, we "must take into account whatever in the record fairly detracts" from the weight of the evidence supporting a Board decision. *Id.; Litton Microwave Cooking Prod. Div. v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989). As the Supreme Court instructs:

We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner [now the ALJ] disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

*Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 468–69. Thus, the Board may find facts and draw inferences different from those of the ALJ, although a reviewing court must examine the evidence more carefully in cases where a conflict exists. *Pease Co. v. NLRB,* 666 F.2d 1044, 1047–48 (6th Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982); *Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814, 820 (6th Cir.1975).

## I

 Applying these principles, we first consider whether there is substantial evidence to support the decision of the Board that the General Counsel made a prima facie showing that a reason for WFB's selection of Wright and Kehl for layoff was their protected activity. The Board's decision is supported by substantial evidence.

As discussed above, to make out a prima facie case, the General Counsel must prove that anti-union animus partially motivated or contributed to the decision to lay off Wright and Kehl. *Birch Run Welding,* 761 F.2d at 1179.

In deciding that the General Counsel made out a prima facie case, the Board relied primarily on Wright's and Kehl's outspokenness, Ring's unlawful remark about firing the crew, Tisher's throwing down the CBA and the timing of the layoffs in close proximity to the employees' protected activities. Disagreeing with the ALJ, the Board found that these facts permit an inference that anti-union animus motivated the layoffs.

Essentially, WFB argues that the evidence as a whole does not show that anti-union animus motivated WFB's selection of Wright and Kehl for layoff. WFB contends that, as fleshed out by the ALJ, the facts do not permit the Board's finding that the General Counsel established a prima facie case. Thus in finding as it did, WFB maintains, the Board must have ignored the findings of the ALJ. We cannot agree.

 Improper employer motivation may be inferred from circumstantial as well as direct evidence. *NLRB v. Link–Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); *Birch Run Welding,* 761 F.2d at

1179. Discriminatory motivation may reasonably be inferred from a variety of factors, such as the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge. *Turnbull Cone Baking Co. v. NLRB,* 778 F.2d 292, 297 (6th Cir. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986) (citing *NLRB v. E.I. DuPont De Nemours,* 750 F.2d 524, 529 (6th Cir.1984)).

Although we might not reach the same result on *de novo* consideration, these cited factors do nevertheless permit the Board's inference of improper employer motivation. The record does not show that WFB deviated from past practices in implementing Wright's and Kehl's layoffs. Nor does it appear to show that WFB expressed hostility towards unionization per se. However, the record certainly permits a finding that WFB expressed hostility towards the painters' complaints regarding its compliance with the CBA. The record also permits a finding that WFB had knowledge of Wright's and Kehl's roles in voicing those complaints. When Minke handed Tisher a copy of the CBA to show him that it required travel pay, Tisher threw the contract on the floor without examining it. And when Minke asked Ring about epoxy pay, Ring responded, "If you guys keep complaining I'm going to fire the whole crew and bring in a whole new crew." Wright and Kehl engaged in what the Board called "continued outspokenness," and WFB acknowledges not only that Tisher, Ring and Bolin knew of the employees' complaints, but also that they responded to those complaints.

The record permits a finding that Wright and Kehl were treated differently from those employees who took a less active role in complaining about what they believed was WFB's non-compliance with the CBA. Assuming Wright and Kehl had work records

similar to the other painters' and were equally skilled—findings the record supports—the only real difference between Wright and Kehl and the other painters is the extent of their engagement in protected activity. Wright and Kehl led the painters' complaints and were laid off. Those painters who did not assume leadership roles or complain as vociferously were not.[8]

In addition, the undeniable fact that WFB hired Miller two weeks before the layoffs allows a finding of an inconsistency between WFB's proffered reason for the layoffs and its other actions, further lending support to the Board's holding. WFB claims it laid off Wright and Kehl because it needed two less painters at the Logan Middle School job and because Wright and Kehl were less qualified than the other painters. WFB's need to lay off two painters could reasonably be considered inconsistent with its hiring Miller two weeks earlier.

Finally, the proximity in time between Wright's and Kehl's activities and their layoff also contributes to an inference of improper employer motivation. On December 24, as part of their campaign, Wright and Kehl held a meeting to air the painters' complaints. Shortly thereafter, Ring remarked that if complaints continued the entire crew would be replaced. On January 10 Wright and Kehl were laid off.

WFB's argument that the Board erred in its decision because it ignored certain findings of the ALJ is unpersuasive. According to WFB, the Board ignored findings such as that neither Ring's remark nor Tisher's throwing down the CBA were directed at Wright or Kehl in particular, that Ring made his remark without intending to fire anyone, and that, as the crew must have known, it would have been "all but impossible" for Ring to replace the whole crew.

Although the Board did not discuss facts of this kind with the same specificity as the ALJ, there is no reason to believe that the Board ignored them. Nothing in them precludes or is inconsistent with the Board's ultimate finding of anti-union animus. The Board simply drew from the same underlying facts as the ALJ a conclusion different from the conclusion drawn by the ALJ. As the Board puts it, it differed from the ALJ merely in deciding the evidentiary significance of the same basic facts. While still factual in nature, the ALJ's finding that WFB did not laid off Wright and Kehl because of their protected activities and the Board's contrary finding are more in the order of complex conclusions than simple facts.

■ Even under the scrutiny applied to a decision in which the Board diverges from the ALJ in finding facts of the garden-variety, the Board's decision is supported by substantial evidence. The significance of an ALJ's findings depends on the importance of witness credibility, *Litton,* 868 F.2d at 857. It depends also on the nature of the findings and their role in a particular scheme of proof. *See Universal Camera,* 340 U.S. at 496–97, 71 S.Ct. at 468–69. As the Supreme Court made plain in *Universal Camera,* "[w]e do not require that the examiner's findings be given more weight than in reason and in light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree." 340 U.S. at 496, 71 S.Ct. at 468–69. We look to the substantiality of the Board's conclusions; we do not weigh the ALJ's.

In this case, the only findings of the ALJ with which the Board disagreed were as to ultimate facts. WFB's arguments notwithstanding, the Board did not contradict the ALJ on questions of witness credibility or reject the factual findings underlying his conclusion that WFB did not lay off Wright and Kehl on the basis of their complaints. As discussed above, the Board merely drew a different conclusion from the conclusion the ALJ drew from the same underlying facts.

■ The ALJ's opportunity to observe witnesses' demeanor "does not, by itself, require deference with regard to his or her derivative inferences. Observation of demeanor makes weighty only the observer's

---

8. Although Minke complained more than some of the painters, he was not as vocal as Wright and Kehl. He also stands in a different position from Wright and Kehl because the CBA requires that as job steward he be laid off last.

testimonial inferences." *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1079 (9th Cir.1977). As the Court in *Penasquitos* explained:

> Deference is accorded the Board's factual conclusions for a different reason—Board members are presumed to have broad experience in labor-management relations. Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute. Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony, unless those inferences are "irrational," "tenuous" or "unwarranted."

*Id.* (citations omitted).

On the basis of those facts, we cannot say that the Board's inferences of improper motivation were in error, even if the evidence might also support a contrary conclusion. Wright's and Kehl's outspokenness, Ring's unlawful remark about firing the crew, Tisher's throwing down the CBA and the timing of the layoffs permit the Board's determination that the General Counsel carried its burden to show that WFB laid off Wright and Kehl on the basis of protected activity. As suggested above, Wright's and Kehl's role as leaders in the campaign of complaints permits an inference of anti-union animus to attach to their being laid off that might not attach to WFB's laying off the other painters.

Even if the Board had rejected findings that underlie the ALJ's decision, instead of just rejecting his ultimate findings of fact or the conclusions he drew from the underlying facts, the result on review would not necessarily be contrary. Although its evidence must be stronger in such a case, the Board may in proper circumstances adopt, reject or modify an ALJ's decision in whole or in part. *Universal Camera,* 340 U.S. at 492–96, 71 S.Ct. at 466–69; *see* Jeffrey A. Norris & Michael J. Shershin, Jr., *How to Take a Case Before the NLRB,* § 17.1 (6th ed.1992). While entitled to weight, the ALJ's finding are not binding on the Board. *Universal Camera,* 340 U.S. at 492–96, 71

S.Ct. at 466–69. Inasmuch as it is the Board's findings of fact, not the ALJ's, that we are commanded to review, *Bales v. NLRB,* 914 F.2d 92, 94 (6th Cir.1990), the Board's modification (like its adoption) of an ALJ's decision must also be upheld if supported by substantial evidence.

Accordingly, we conclude that substantial evidence supports the decision of the Board that the General Counsel established a prima facie case.

## II

Next, we examine whether there is substantial evidence to support the decision of the Board that WFB failed to rebut the General Counsel's prima facie case by showing that WFB had a legitimate business purpose for laying off Wright and Kehl. Again, we find that substantial evidence supports the Board's decision.

When, as discussed above, the General Counsel establishes a prima facie case, the employer must show by a preponderance of the evidence that the employees would have been laid off even if they had not engaged in protected activity. *Cook Family Foods,* 47 F.3d at 816; *Birch Run Welding,* 761 F.2d at 1179. This showing is regarded as an affirmative defense, and if the proffered business justification is deemed pretextual, the defense fails. *NLRB v. Vemco, Inc.,* 989 F.2d 1468, 1482 (6th Cir.1993).

On this prong of the inquiry, the Board concluded that WFB had not carried its burden because Tisher's testimony—the only evidence of WFB's purported reason for laying off Wright and Kehl—was "vague and conclusory testimony, unsupported by any specific or objective evidence"; because the ALJ found that Wright and Kehl were both experienced painters capable of performing trim work and were "at least as good" as the other painters; and because Miller started work at the project less than two weeks before the layoff.

Because the Board reached the negative conclusion that WFB did not carry its burden to show a legitimate business purpose for laying off Wright and Kehl, our substan-

tial evidence review on this prong of the inquiry is of a slightly different stripe than on the prima-facie-case prong. The inquiry is not so much whether substantial evidence supports the Board's negative determination as whether the Board's finding WFB's evidence insufficient is reasonable in view of the evidence as a whole. Whether or not we would have reached the same result on *de novo* review, we cannot say that the Board's decision is not supported by substantial evidence.

Although Tisher testified that Wright and Kehl were less qualified than the other painters, the record furnishes the Board ample reason to reject Tisher's testimony. The ALJ was unable to conclude that Tisher was telling the truth on this point. And as the Board found, the testimony was vague and conclusory and unsupported by specific or objective evidence. Tisher testified without elaboration that he selected Wright and Kehl for layoff because they were not as well qualified as the other painters. He averred merely, "I just chose the best ones to do the job and laid the other two off, or I kept the people I felt were the best qualified to finish the job is what it was." Even on specific inquiry, Tisher failed to articulate with any precision why he considered the other painters more qualified than Wright and Kehl. *See NLRB v. Brooks Cameras, Inc.*, 691 F.2d 912, 915 (9th Cir.1982) (explaining that "the Board is not required to accept an employer's self-serving declarations even when credited by the administrative law judge, but may draw its own inferences, giving such statements the weight it deems appropriate"). We cannot conclude that the Board erred in disregarding Tisher's testimony on this point.

Accordingly, we conclude that substantial evidence supports the decision of the Board that WFB failed to show that it had a legitimate business purpose for laying off Wright and Kehl.

## CONCLUSION

For reasons discussed above, we conclude that the decision of the Board is supported by substantial evidence. Therefore, the petition for review is denied.

IT IS SO ORDERED.