**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0412n.06
Filed: May 18, 2005

**Nos. 04-1049, 04-1246**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED PARCEL SERVICE,

       Plaintiff-Appellant/Cross-Appellee,

v.

NATIONAL LABOR RELATIONS BOARD,

       Defendant-Appellee/Cross-Appellant.
_____/

ON APPEAL FROM
A DECISION OF THE
NATIONAL LABOR
RELATIONS BOARD

**BEFORE:**    **MARTIN and GILMAN, Circuit Judges; and COHN, District Judge.**[*]

**AVERN COHN, District Judge.**  This is an action for review of an order by the National Labor Relations Board ("NLRB" or "Board") finding that Plaintiff-Appellant United Parcel Service ("UPS") violated sections 8(a)(1) and 8(a)(3)[1] of the National Labor Relations Act ("NLRA") in terminating the employment of the charging party, Paul Stimpson ("Stimpson"). The Board found that Stimpson was terminated for engaging in

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]The Board also charged a violation of section 8(a)(4) of the NLRA, which was denied and is not contested on appeal.

protected concerted activity. We find substantial evidence that Stimpson was terminated in retaliation for his grievance activity. As such, the NLRB's decision is AFFIRMED and the Court GRANTS enforcement of its order.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Stimpson's Employment History

Stimpson began his employment with UPS in 1991 as a part-time sorter. Stimpson was a member of Local 243 of the International Brotherhood of Teamsters, AFL-CIO ("Local 243" or "the union"), and the terms and conditions of his employment were governed by a collective bargaining agreement ("CBA") between Local 243 and UPS. During all relevant times, Stimpson was supervised by, among others, UPS Operations Manager Ken Wilson ("Wilson"). Davis Staiger ("Staiger") was the Union Steward who processed many of the grievances filed by Stimpson.

### B. Stimpson's Employment History and Grievance Activity

Over the course of his employment, Stimpson was involved in grievance activity on both a collective and individual basis as well as subjected to discipline.

In July 1995, Stimpson was terminated for allegedly using vulgar language and making racial remarks. Stimpson grieved his termination. After a hearing, his termination was reduced to a suspension with a final warning against the use of such language.

In July 1996, Stimpson and eighteen other employees in his unit filed a grievance protesting the supervisors' performance of unit work in violation of the CBA. After

2

Staiger presented the grievance to Wilson, Wilson held a meeting with the signatories to the grievance. According to Staiger, Wilson warned that those with attendance problems "should watch what they're signing and be careful what they're signing."

On June 26, 1997 Stimpson filed a grievance protesting a June 23, 1997 letter from Wilson which stated that because Stimpson had suffered thirteen on-the-job injuries to date, he would "leave the Company no alternative but to take disciplinary action up to and including discharge," if he continued to suffer such injuries.

About a month later, on July 11, 1997, Stimpson filed another grievance alleging sexual harassment in the workplace over UPS's failure to stop a rumor. Apparently, Stimpson complained to Wilson that a co-worker started a rumor that Stimpson slept with prostitutes and abused his girlfriend. When Stimpson asked Wilson to speak with the co-worker, Wilson allegedly refused, stating that he rumor was "probably true." At the hearing regarding the grievance, UPS management agreed to speak to the co-worker and provide Stimpson with a follow-up. According to Stimpson, he never received a follow-up and further says that UPS management "chuckled" while reading the grievance. Stimpson later confronted the co-worker directly about the rumor, an argument ensued, and Stimpson was suspended over the incident.

On July 14, 1997, Stimpson filed another grievance alleging that UPS had disregarded the seniority list by assigning preferential "extra" work to an employee with less seniority than Stimpson.

On July 28, 1997, Stimpson filed a grievance over his suspension stemming from

3

the argument with his co-worker regarding the rumor discussed above.

About three months later, on October 6, 1997, Stimpson filed a grievance over another supervisor's response to Stimpson's complaint about extra work being assigned to individuals with less seniority. The supervisor allegedly remarked that Stimpson was "stupid or unable to perform the extra work."

On November 13, 1997, Staiger presented Wilson with another grievance concerning safety problems in the sorting area which allegedly placed employees at risk of injury or death. Eleven unit employees signed the grievance. The grievance contains an illegible signature that may have been Stimpson's, although this was never verified. Upon receipt of the grievance, Wilson, according to Staiger, said that he would be watching anyone who had signed the grievance and would write them up if they were missorting packages.

Three months later, on February 13, 1998, Stimpson received a written warning for missorting packages. On February 24, 1998, Stimpson filed a grievance regarding the warning. He noted that he had previously complained to management, including Wilson, about other employees missorting packages, but that no action was taken against them.

In March 1998, Stimpson met with Wilson and Union Steward Althea Streeter ("Streeter") to discuss a grievance matter. Wilson held a copy of the unfair labor practice charge, discussed below, that Stimpson has filed against UPS. Wilson asked Stimpson "Why are you filing these bull shit charges against us?"

Thereafter, sometime in the Spring of 1998, Wilson, according to Stimpson, called

4

him a "troublemaker" in reference to the number of grievances he filed.

### C. Stimpson's On-The-Job Injuries and Related Grievance Activity

As stated above, Stimpson received a letter regarding his thirteen on-the-job injuries in June 1997. On November 18, 1997, Stimpson suffered another injury. He injured his wrist when some large packages he was sorting toppled. Stimpson was treated at a UPS-run clinic and was advised not to lift more than five pounds while his wrist healed. Stimpson informed his supervisor, Vince Marino ("Marino"), of his restriction and requested to be assigned to light duty work. Marino refused and Stimpson re-injured his wrist.

On December 7, 1997, a meeting was held between UPS management, Stimpson, and a union representative. UPS management noted that Stimpson has been injured a total of fourteen times and, according to Stimpson, stated that UPS did not want employees like Stimpson working for it.

Two days later, on December 9, 1997, Stimpson received a letter from UPS, referring to the June 1997 letter, and "officially" warning him that he had too many on-the-job injuries. It further stated that additional injuries could result in disciplinary action, including termination.

On December 14, 1997, Stimpson filed a grievance protesting the job-related injury warnings. On December 15, 1997, Stimpson requested from Wilson information on job-related injuries. By February 24, 1998, UPS still had not provided Stimpson with the requested information and Stimpson, through the union, filed an unfair labor practice

charge as a result. At a subsequent hearing, the grievance was resolved by reducing the written warning to a verbal notice and expunging all warnings about job-related injuries from Stimpson's employment record.

## D. Incidents Leading to Stimpson's Termination

On August 17, 1998, while Stimpson and his co-worker Kevin Gunnery ("Gunnery") were sorting packages, some packages became stuck on a conveyer belt. Gunnery stepped onto the belt to dislodge the packages, a task which under the CBA is to be performed only by a supervisor. Stimpson told Gunnery "I thought you were pulling bulk today, I didn't think you were a manager or a supervisor." Gunnery became upset at the remark, yelled obscenities at Stimpson, and threatened to "beat his ass." Stimpson motioned that he accepted the challenge and called Gunnery a "kiss ass." Gunnery complained to Wilson, who called both men into his office and warned them that they would both be terminated if such an incident occurred again.

On October 1, 1998, while driving a bulk train, Stimpson accidentally hit a cart. His co-worker, Ernie Rodriguez ("Rodriguez"), saw the incident and said that Stimpson should take lessons from, and learn to drive, like Gunnery. Stimpson jokingly responded that "I don't want to learn how to be a suck dick."[2] Rodriguez, Stimpson, and another co-worker, Timothy Lee ("Lee'), were the only ones who heard the exchange, and all laughed at Stimpson's remark. Stimpson then drove off and left for the day at the end of

_____

[2]According to Stimpson, Gunnery had a reputation of playing the role of a management favorite.

his shift.

Moments later, Gunnery drove his bulk train into the area and asked Lee what had been said. After Lee told him, Gunnery complained to Wilson that Stimpson had called him a "cocksucker." Wilson obtained written statements from Lee, Rodriguez, and Gunnery. After consulting his supervisor, Wilson suspended Stimpson. Stimpson was later discharged. The reasons were explained in an October 6, 1998 letter which stated that his "comments directed towards another employee were totally inappropriate, intimidating, antagonistic and offensive [and] could be construed as sexual harassment towards a fellow employee."

### E. Events Following Stimpson's Termination

Stimpson grieved his termination. A joint arbitration panel conducted a hearing and issued a decision on March 18, 1999 denying the grievance and upholding Stimpson's termination.

On February 9, 1999, Stimpson filed the instant unfair labor practice charge with the Board. A hearing was held before an Administrative Law Judge ("ALJ") where the following individuals testified: Stimpson, Wilson, Lee, Staiger, and Streeter. The ALJ concluded that Stimpson established a prima facie case of retaliatory discharge and that UPS failed to carry its burden of showing that Stimpson's discharge was unrelated to his protected activity. The ALJ also determined that no deference was owed to the joint arbitration panel's decision because the panel did not consider Stimpson's protected activity in relation to his discharge.

7

Upon review of the ALJ's decision, a panel of the Board agreed with the ALJ that Stimpson was discharged in violation of the NLRA and affirmed the ALJ's order to, among other things, offer reinstatement to Stimpson.[3] One panel member dissented, concluding that UPS rebutted Stimpson's prima facie case by showing that it would have discharged Stimpson even absent his protected activity.

UPS appeals the order. The NLRB cross appeals for enforcement. Stimpson has intervened.

## II. ANALYSIS

### A. Whether the Board's Decision is Supported by Substantial Evidence

#### 1. Standard of Review

"We review the [NLRB's] conclusions of law *de novo* ... If the [NLRB] errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no reasonable basis in law." *N.L.R.B. v. Good Shepherd Home,* 145 F.3d 814, 816 (6th Cir. 1998) (quoting *N.L.R.B. v. Pentre Elec.*, 998 F.2d 363, 368 (6th Cir. 1993)). We review the NLRB's factual findings under a deferential standard. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." NLRA § 10(e), 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 493 (1951); *N.L.R.B. v. St. Francis Healthcare Ctr.,* 212 F.3d 945, 951-52 (6th Cir. 2000). "Evidence is substantial when it

---

[3]The Board modified the ALJ's order in manners not relevant to the instant appeal.

is adequate, in a reasonable mind, to uphold the [NLRB's] decision." *St. Francis,* 212 F.3d at 952 (internal quotation marks omitted). However, even when reviewing factual questions, we will not serve "as a mere rubber stamp for the administrative agency." *N.L.R.B. v. Cook Family Foods,* 47 F.3d 809, 816 (6th Cir. 1995) (quoting *YHA, Inc. v. N.L.R.B.,* 2 F.3d 168, 172 (6th Cir. 1993)).

## 2. Legal Framework

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [those] rights...." 29 U.S.C. § 158(a)(1). Section 8(a)(3) proscribes employer "discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). "It is settled that if an employer discharges 'an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual,' the employer violates section 8(a)(3) and (1) of the Act." *N.L.R.B. v. E.I. DuPont de Nemours*, 750 F.2d 524, 528-29 (citing *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 398 (1983)). Thus, a violation of section 8(a)(3) constitutes a derivative violation of section 8(a)(1). The General Counsel bears the burden of proving a violation. *See id.*

In *Transportation Management*, *supra*, the Supreme Court approved the Board's

9

approach, established in *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), to analyzing cases "involving charges of employment actions motivated by anti-union animus and employer protestations of legitimate reasons for the actions." *W.F. Bolin Co. v. N.L.R.B.,* 70 F.3d 863, 870 (6th Cir. 1995) (quoting *Birch Run Welding & Fabricating Inc. v. N.L.R.B.,* 761 F.2d 1175, 1179 (6th Cir. 1985)). First, the General Counsel must establish by a preponderance of the evidence a prima facie case that anti-union animus motivated or contributed, at least in part, to an employment action. *See Transp. Mgmt.,* 462 U.S. at 400. A prima facie case contains the following elements: (1) the employee engaged in protected activity, (2) the employer knew of the activity, and (3) the employer demonstrated hostility towards the protected activity, and (4) adverse action taken against the employee. *See Wright Line*. Once a prima facie case is established, the employer can avoid being held in violation of sections 8(a)(1) and 8(a)(3) if it proves, also by a preponderance of the evidence, that the employment action "rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Transp. Mgmt.,* 462 U.S. at 400. This latter showing is regarded as an affirmative defense, and if the proffered business justification is deemed pretextual, the defense fails. *See W.F. Bolin Co.*, 70 F.3d at 873.

### 3. Application

UPS argues that the Board erred in finding that the General Counsel had established a prima facie case and takes particular issue with the finding that Stimpson's

termination was motivated by protected-activity animus.[4]  Although UPS frames the issue

as the Board misapplying the *Wright Line* test, UPS essentially argues that the record

does not contain sufficient evidence of animus towards Stimpson's grievance activity and

is instead based on Stimpson's vague beliefs and on statements from Wilson made well

before Stimpson's termination.  The General Counsel and Stimpson argue that the record

contains sufficient evidence of UPS's hostility towards Stimpson's grievance activity.

Upon review of the record, we conclude that the Board's finding of evidence of

employer animus is substantially supported.  Wilson told Stimpson in the Spring of 1998

that he was a "troublemaker" because of his involvement in filing grievances.  This

statement was made only six months before his termination and at a time when Stimpson

was engaged in filing numerous grievances.  Moreover, Wilson responded to Stimpson's

filing of an unfair labor practice charge regarding his request for information of job-

related injuries by asking him why he was filing "bull shit" charges against UPS.  Such

statements can constitute evidence of animus.  *See Dayton Typographical, Inc. v.*

*N.L.R.B.*, 778 F.2d 1188, 1193 (6th Cir. 1985) (employer's statement that employee had a

"bad attitude and created friction" by pressing for resolution of problem created inference

that employee was terminated for engaging in protected activity).  *See also James Julian*

*Inc. of Delaware*, 325 N.L.R.B. 1109, 1111 (1998) (employer's reference to a union

steward who filed numerous grievances as a "troublemaker" constituted evidence of

---

[4]UPS does not dispute that Stimpson engaged in protected activity, that UPS was aware of such activity, or that Stimpson suffered an adverse action.

11

union animus).

There is also evidence that Stimpson was threatened with termination if he suffered another job-related injury. Wilson also warned employees in July 1996, in response to filing a grievance to which Stimpson was a signatory, to be careful about what they sign. In 1997, in response to another collective grievance, Wilson stated he would write anyone up who was missorting packages. Although it is not clear that Stimpson signed that grievance, it is noted that Stimpson was written up for missorting just three months later and Stimpson grieved that discipline. While UPS makes much of the fact that Wilson's statements in 1996 and 1997 were well before Stimpson's termination, we agree with the Board that although remote in time, they are nonetheless persuasive "because Wilson, the same supervisor involved in Stimpson's discharge ... made the earlier statements expressing the same hostility towards the filing of grievances." Thus, we find that General Counsel established a prima facie case of a violation of sections 8(a)(1) and (3).

UPS next argues that the Board erred in finding that UPS failed to establish that it would have discharged Stimpson regardless of his protected activity. UPS says the Board ignored Wilson's testimony regarding why he terminated Stimpson -- for using inappropriate language towards a co-worker after being warned against it. UPS also says the Board ignored Streeter's testimony regarding the use of such language in the workplace, and testimony that UPS was not given notice of similar acts of misconduct such that Stimpson could claim selective discriminatory treatment.

12

Contrary to UPS's argument, the record is replete with evidence, as the Board noted, that vulgarities such as those made by Stimpson on October 1, 1998 were common in the workplace. Such remarks were often met with laughter, as was Stimpson's. For instance, Lee testified that "everyone," including Gunnery, used profanities and no one reported to management because it was not taken seriously. Lee also testified that he was never disciplined for using profanity and that he thought Stimpson's remark was funny. Sraiger confirmed this testimony. While UPS relies on Streeter's testimony that use of profanity or vulgarities is grounds for verbal or written warnings, this does not support a finding that UPS would have terminated Stimpson because she also testified that she had no knowledge of a written rule prohibiting profanity or that anyone was ever discharged for using profanity. Also notable is the fact that UPS introduced no evidence that it terminated other employees for using profanity or vulgarity in the workplace. In short, there is substantial evidence in the record to support the Board's finding that UPS failed in its burden of showing it would not have terminated Stimpson because of his choice of language on October 1, 1998.

We further note that UPS's reason for termination is made more problematic when the October 1, 1997 incident is carefully considered. Stimpson made the remark to a third person, Rodriguez, in the presence of another co-worker, Lee. Gunnery only heard about the remark through Lee. Gunnery then reported it, somewhat inaccurately, to Wilson. During his investigation, Wilson did not ask for a statement or explanation from Stimpson. We agree with the Board majority that this incident is completely different

13

from the August 17, 1998 direct confrontation between Gunnery and Stimpson, both in terms of the nature of the language exchanged and the circumstances of the exchange. Stimpson's remark about Gunnery on October 1, 1998 amounted to nothing more than common workplace banter.

As to the dissenting member's opinion, his reliance on Wilson's testimony that Stimpson's termination was not based on his grievance activity was misplaced. Wilson's testimony that he considered Stimpson a threat to the workplace by "stirring stuff up" and "causing trouble" are similar to Wilson's "troublemaker" comment and actually further support that Wilson harbored animus towards Stimpson. At the very least, these statements undermine his testimony as to the motive for termination and are evidence of pretext. Moreover, the Board does not have to credit self-serving declarations of motive. *See W.F. Bolin Co., supra,* at 874. The dissenting member's conclusion that UPS would have terminated Stimpson independent of his protected activity in order to maintain civility in the workplace is belied by the record evidence of extensive use of profanities in the workplace and by the fact that UPS offered no evidence that it terminated another employee for use of profanity. In short, there is substantial evidence in the record to support the Board's finding that Stimpson was terminated in violation of sections 8(a)(1) and (3).

### B. Whether the Board Erred in Declining to Defer to the Joint Arbitration Panel's Decision

#### 1. Standard of Review

14

This Court reviews the NLRB's decisions on deference for abuse of discretion, *NLRB v. Magnetics Int'l, Inc.,* 699 F.2d 806, 812 n.5 (6th Cir. 1983).

## 2. Legal Framework

The NLRB's deferral to the factual findings of an arbitral decision or a joint grievance panel decision is governed by the standards set forth in *Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955), and in *Olin Corp.,* 268 N.L.R.B. No. 86 (1984). Deferral is appropriate where (1) the contractual issue is factually parallel to the unfair labor practice issue, and (2) the arbiter was presented generally with the facts relevant to resolving the unfair labor practice. *Olin Corp.,* 268 N.L.R.B. at 574.

## 3. Application

Here, the ALJ determined that deferral to the joint panel's decision upholding Stimpson's termination was not warranted because "the decision by the panel was based on its consideration of Stimpson's misconduct without any reference to his protected activity." The Board did not address the issue.

Although the issue of Stimpson's termination was before the joint panel, a review of its decision confirms that it was confined to examining Stimpson's conduct on October 1, 1998. There is no reference in the decision to Stimpson's protected activity. The panel's decision states in its entirety:

> Statement of Facts:
> On 10-1-98 I was driving bulk, I inadvertently hit a push cart in front of line 8, an employee said, "You should learn how to drive from Kevin," referring to Kevin Gunnery and [sic] employee I had differences with in the past. I make an off color remark about Kevin I regret, to Ernie and Tim. It wasn't intended to be cruel or

15

demeaning just part of the normal slang that exists at UPS. I hope Kevin and I can work past any hard feelings. I want to return to work and close this issue. I understand that certain words are offensive and I will watch out for them in the future. I made a slip of the tongue.
Decision:
Based on the facts presented and the evidence presented by the grievant, the claim of the Union is denied.

There is no evidence in the record that the joint panel considered evidence of Stimpson's grievance activity in its decision. Although four days before the hearing before the joint panel, Stimpson filed an amended charge against UPS alleging a retaliatory discharge, the record simply fails to show that the joint panel was presented with evidence of Stimpson's grievance activity as a motivation for his termination. Indeed, Stimpson testified before the ALJ that he did not mention his "union activity" to the joint panel. A transcript of the hearing is not in the record. Under these circumstances, there was no abuse of discretion in failing to give any effect to the joint panel's decision.

## III.  CONCLUSION

For the reasons stated above, the NLRB's decision is AFFIRMED and the Court GRANTS enforcement of its order.

16