NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0697n.06
Filed: November 14, 2008

Nos. 06-2038/07-1406/07-1407

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE NATIONAL LABOR |
| v. | ) | RELATIONS BOARD |
| | ) | |
| CONSOLIDATED BISCUIT COMPANY, | ) | |
| | ) | |
| Respondent/ Cross-Petitioner. | ) | |
| | ) | |
| | ) | |

Before: DAUGHTREY and GIBBONS, Circuit Judges; ZATKOFF, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** The National Labor Relations Board ("Board")

seeks enforcement of its decision and order finding that Consolidated Biscuit Company ("CBC")

committed a number of violations of section 8(a)(1) and (3) of the National Labor Relations Act

("Act"), 29 U.S.C. § 158, and ordering a new union election at CBC's McComb, Ohio,

manufacturing facility. CBC has cross-petitioned, seeking review of certain aspects of the Board's

decision. The Bakery, Confectionary, and Tobacco Workers and Grain Millers International Union,

AFL-CIO, ("Union") has intervened, seeking review of other aspects of the Board's decision. The

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District
of Michigan, sitting by designation.

1

CBC and Board have both filed motions to strike the Union's brief, on the grounds that this court lacks jurisdiction to consider the Union's arguments.

For the reasons set forth below, we enforce the Board's order in full. Additionally, we deny the motions to strike the Union's brief.

## I.

This case arises out of a union organizing drive conducted at CBC's McComb, Ohio, facility, where CBC manufactures cookies, crackers, and other baked goods. Beginning in February 2002, some of CBC's employees began promoting union organization. On May 21, 2002, employees supporting the Union began demonstrating in front of the CBC facility, and the Union filed a representation petition with the Board shortly thereafter. In a representation election conducted on August 15, 2002, employees rejected union representation. Employees cast 286 votes in favor of representation and 485 votes against it.

The Union filed unfair labor practice charges with the Board between May 24, 2002, and April 25, 2003. The Union also filed objections to conduct affecting the results of the election. On February 26, 2003, the General Counsel issued a consolidated complaint, and subsequently issued an amended consolidated complaint on April 30, 2003. In the complaints, the General Counsel alleged that CBC violated section 8(a)(1) of the Act on numerous occasions prior to the August 15, 2002, election. Additionally, the General Counsel contended that CBC violated section 8(a)(3) and (1) of the Act in disciplining or discharging eight union-supporting employees.

Following a ten-day hearing, an administrative law judge ("ALJ") issued a lengthy decision on January 14, 2004. The ALJ found that CBC violated section 8(a)(3) and (1) in:

1. Terminating the employment of William Lawhorn on August 16, 2002.
2. Terminating the employment of Russell Teegardin on August 26, 2002.
3. Terminating the employment of John Green on September 18, 2002.
4. Terminating the employment of Gary Hill on January 3, 2003.
5. Terminating the employment of Thomas Thompson on January 3, 2003.
6. Terminating the employment of Tyrone Holly on January 20, 2003.
7. Terminating the employment of Patti Wickman on January 21, 2003.
8. Issuing a disciplinary warning to Russell Teegardin on June 22, 2002.
9. Issuing a written warning to Russell Teegardin on June 26, 2002.
10. Disqualifying [Cheri] Todd from the position of temporary or fill-in lead on May 21, 2002.

The ALJ additionally determined that CBC committed the following eighteen violations of section

8(a)(1) of the Act:

1. By Gary Birkemeyer, in the early spring of 2002, in telling Tyrone Holly not to talk about the Union on company time and telling Holly that he was harassing employees about the Union.

2. By Diane Tate, in April or May 2002, in suggesting to Tyrone Holly that it would be futile to support the Union.

3. By Margie Brown, in May or June 2002, in suggesting to Tyrone Holly that supporting the Union would be futile.

4. By Mark Wurgess in instructing CBC security guards to call the police at the first sign of union activity and by [CBC] in calling the police to the McComb plant on May 21, 2002.

5. By Dan Kear, on May 21, 2002, in telling [Cheri] Todd that she could not be a temporary lead on account of her union activities on the previous night.

6. By erecting signs indicating video surveillance of areas in which prounion employees were congregating, on May 23, 2002.

7. By Susan Henry, in announcing to employees, that they could lose their Christmas bonus if they supported the Union.

8. By James Keller, in telling employees that selecting the Union would cause Respondent to lose contracts and go bankrupt.

9. By Yolanda Means, in July 2002, in suggesting to Tyrone Holly that it was futile to support the Union.

10. By Betty Gerren on June 7, 2002, in threatening employee with stricter discipline if they chose to support the Union.

11. By a security guard, on or about June 14, 2002, in telling Cathy Hill that she could not distribute union literature on company property.

12. By Richard Quinn, in restraining and interfering with the protected union activities of Gary Hill and Thomas Thompson, and by placing a disciplinary note in each of their personnel files on or about June 27, 2002.

13. By Dennis Herod in suggesting to Thomas Thompson on or about August 1, 2002, that CBC President James Appold might move production lines out of the McComb facility if employees selected the Union.

14. By James Appold in August 2002, in suggesting to employees that benefits currently enjoyed would be lost if they selected the Union as their collective-bargaining representative.

15 By assigning Tammy Medina more onerous work on or about August 11, 2002, due to her vocal support for the Union.

16. By Betty Gerren, on August 10, 2002, by telling William Lawhorn and other employees that Lawhorn would be fired if the Union lost the representation election.

17. By Dan Kear and Gary Birkemeyer, on or about August 13, 2002, by requiring Patti Wickman and Cathy Hill to remove magic marker messages supporting the Union from their arms.

18. By Kelly Frey, on August 21, 2002, in telling Thomas Thompson that his union was not around to protect him anymore.

The ALJ recommended the issuance of a broad order requiring CBC to cease and desist from infringing on its employees' rights. He further recommended that the union representation election of August 15, 2002, be set aside and a new election conducted.

4

Both CBC and the General Counsel filed exceptions to the ALJ's decision. In an April 28, 2006, decision and order, the Board affirmed in part and reversed in part the ALJ's findings. With respect to five section 8(a)(1) violations, the Board reversed the ALJ. Specifically, the Board found that CBC did not violate section 8(a)(1) when: (1) Yolanda Manns made a comment to Tyrone Holly about the Union; (2) CBC erected signs indicating video surveillance and no trespassing; (3) CBC assigned Tammy Medina to relieve seven machine operators; (4) supervisors instructed Patti Wickman and Cathy Hill to remove marker messages from their arms; and (5) a supervisor made a comment about the Union to Thomas Thompson. The Board also reversed five of the ALJ's section 8(a)(3) findings; the Board concluded that CBC lawfully terminated Green, Hill, Thompson, Holly, and Wickman.

Board Member Walsh dissented in part from the Board majority's decision.[1] The dissent concluded, like the ALJ, that CBC violated section 8(a)(3) and (1) when it discharged Green, Hill, Thompson, Holly, and Wickman. Additionally, the dissent found that CBC violated section 8(a)(1) when it erected video surveillance and no trespassing signs near the area where union supporters had been congregating, as well as when supervisor Kelly Frey told Thompson that his union was not around to protect him anymore.

The Board, like the ALJ, issued a broad cease-and-desist order, to which no exceptions were filed. Member Schaumber dissented from the issuance of the broad order. The Board's order required CBC to take the following affirmative actions: offer Todd the position of fill-in lead; offer reinstatement to Lawhorn and Teegardin; make Lawhorn, Teegardin, and Todd whole for any lost

---

[1]Chairman Battista and Member Schaumber constituted the majority.

earnings or benefits; remove from its files any reference to unlawful warnings and discharges and notify the employees that this has been done; and post copies of a remedial notice. The Board further ordered that the August 15, 2002, election be set aside and a new election be conducted.

On August 2, 2006, the Board petitioned this court for enforcement of its decision and order. CBC has cross-petitioned and seeks reversal of those portions of the Board's decision and order not in its favor. The Union has filed an intervenor's brief challenging the Board's determination that CBC lawfully terminated Green, Hill, Thompson, Holly, and Wickman.

**II.**

While this court reviews *de novo* the Board's legal conclusions, the Board's factual findings will be upheld if supported by substantial evidence on the record. *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) (per curiam); 29 U.S.C. § 160(e). Additionally, the substantial evidence standard applies to the Board's application of law to particular facts. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 514 F.3d 574, 580 (6th Cir. 2008). "Factual findings are supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support a conclusion." *NLRB v. Int'l Bhd. of Elec. Workers*, 514 F.3d 646, 649 (6th Cir. 2008) (internal quotation marks and citations omitted). Under the substantial evidence standard, "the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*." *Harborside Healthcare, Inc. v. NLRB*, 230 F.3d 206, 208 (6th Cir. 2000) (quoting *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 952 (6th Cir. 2000)).

The substantial evidence standard applies "even if the NLRB and the ALJ relied on the same facts to reach different conclusions. 'Our deference to findings of fact runs in favor of the Board, not in favor of the ALJ.'" *NLRB v. Local 334, Laborers Int'l Union of N. Am.*, 481 F.3d 875, 879 (6th Cir. 2007) (quoting *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995)). "The 'substantial evidence' standard is not modified in any way when the Board and [the ALJ] disagree," although "evidence supporting a conclusion may be less substantial when an [ALJ] . . . has drawn conclusions different from the Board's than when he has reached the same conclusion." *W.F. Bolin*, 70 F.3d at 870.

## III.

1.CBC contends that the Board erred in finding that the company violated section 8(a)(3) and (1) of the Act by terminating Russell Teegardin and William Lawhorn, by issuing disciplinary warnings to Teegardin on June 22, 2002, and June 26, 2002, and by disqualifying Cheri Todd from the position of temporary or fill-in lead on May 21, 2002. In turn, the Board—which summarily adopted the ALJ's findings with respect to these section 8(a)(3) and (1) violations—argues that these findings are supported by substantial evidence.

Under section 8(a)(3) of the Act, an employer may not discriminate with respect to the terms or tenure of employment for the purpose of discouraging employee membership in any labor organization. 29 U.S.C. § 158(a)(3); *W.F. Bolin*, 70 F.3d at 870. In other words, "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." *W.F. Bolin*, 70 F.3d at 870 (citations and quotation marks omitted).

Where a case involves "charges of employment actions motivated by antiunion animus and employer protestations of legitimate reasons for the actions," this court employs a burden-shifting analysis. *Id.*; *see also Ishikawa Gasket Am., Inc. v. NLRB*, 354 F.3d 534, 537 (6th Cir. 2004). At the outset, the Board bears the initial burden of demonstrating, by a preponderance of the evidence, that (1) the employee was engaged in activity protected under the Act, (2) the employer knew of the activity, and (3) animus toward the protected activity motivated the employer's adverse action. *Ctr. Constr. Co., Inc. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007). A number of factors may indicate discriminatory motive, including:

> the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge.

*NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000) (quoting *W.F. Bolin*, 70 F.3d at 871). The burden then shifts to the employer to demonstrate, by a preponderance of the evidence, that it would have made the same decision without regard to the fact that the employee engaged in protected activity. *Id.* The determination of an employer's motive is a factual question and is thus subject to the substantial evidence standard. *See Int'l Bhd. of Elec. Workers*, 514 F.3d at 649.

As the ALJ observed, there is generally no dispute that CBC was aware of the union activities of Teegardin, Lawhorn, and Todd when it took adverse actions against them. The question, then, is whether anti-union animus motivated CBC, or whether CBC would have taken the same actions even if the employees had not engaged in union activities.

We note that the ALJ found that the section 8(a)(3) violations also constituted section 8(a)(1) violations. Section 8(a)(1) makes it an unfair labor practice for an employer "'to interfere with, restrain, or coerce employees in the exercise of their rights' to organize, join, or assist unions, bargain collectively, and engage in collective action." *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005) (quoting 29 U.S.C. § 158 (a)(1)). While section 8(a)(3) and section 8(a)(1) are not coterminous, "A violation of section 8(a)(3) of the Act necessarily interferes with the exercise of statutory rights, and therefore derivatively violates section 8(a)(1) of the Act." *Hosp. Cristo Redentor, Inc. v. NLRB*, 488 F.3d 513, 518 n.1 (1st Cir. 2007) (citing *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n. 4 (1983)); *accord Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 689 (6th Cir. 2006).

## A.

The ALJ found, and the Board summarily affirmed, that the discharge of Russell Teegardin, as well as the disciplinary warnings issued to him on June 22 and June 26, 2002, constituted a violation of section 8(a)(3) of the Act (and, presumably, a derivative violation of section 8(a)(1)). Teegardin worked at CBC as a second-shift maintenance mechanic from August 2000 until his termination on August 26, 2002. Teegardin, a leader in the organizing drive, began lobbying for union organization in February 2002, and CBC became aware of Teegardin's pro-union sentiment in March 2002, when he was told by supervisors not to place union literature on company bulletin boards. In late May 2002, Teegardin and others began distributing handbills for the Union in an area outside the CBC facility that was under surveillance and visible to CBC president James Appold from his office. The dissemination of union literature continued until the August 15 election.

Teegardin, along with Lawhorn, stood outside the facility nearly every day soliciting employees to join the Union.

On June 5, 2002, a human resources officer ran a criminal background check on Teegardin (no criminal records were found). The ALJ concluded that, given the absence of any credible alternative explanation from CBC, this background check was motivated by CBC's hostility toward Teegardin's union activity.

**1.**

On June 22, 2002, CBC placed in Teegardin's personnel file a memo relating a verbal warning given to him by supervisor Al Wilson. In the memo, Wilson explained that he told Teegardin that CBC had received "a couple of complaints, that he was harassing people about union support."[2] Wilson asked Teegardin not to be "so forceful" when discussing the Union and not to "keep after" other employees about the Union. Although the General Counsel did not allege a violation with respect to the June 22, 2002, warning, the ALJ *sua sponte* found that CBC had violated section 8(a)(3) and (1) in issuing the warning.

Disciplinary action falling short of discharge may violate section 8(a)(3) and (1) of the Act. *See, e.g.*, *Sam's Club v. NLRB*, 141 F.3d 653, 655 (6th Cir. 1998). Indeed, the June 22 warning—a disciplinary action in itself—was relied upon in part when CBC issued a second written warning to Teegardin on June 26, which in turn noted that further infractions could lead to termination.

---

[2]As the ALJ noted, there were two versions of the memo in Teegardin's personnel file, with only one referencing Teegardin's union activity. The ALJ concluded that the memo was intentionally modified to omit any mention of union activity.

Substantial evidence supports the ALJ's finding that this June 22 disciplinary action was pretextual. The proffered reason for the warning was Teegardin's "harassment" of unnamed employees regarding union support. The ALJ found, however, that CBC did not have a valid nondiscriminatory rule prohibiting employees from discussing unionization during worktime. Moreover, Teegardin's discussion of unionization was protected even if other employees subjectively considered it "harassment." *See Nicholas County Health Care Cent.*, 331 N.L.R.B. 970, 981 (2000) ("It is well settled that an employer cannot lawfully take disciplinary action to stop subjectively offensive activity without regard to whether that activity is protected by the Act."). Wilson's vague assertion of charges of harassment from unnamed employees is, as the ALJ found, simply insufficient to show that his warning to Teegardin was prompted by actions unprotected by the Act. Finally, the ALJ's finding of a violation is supported by his conclusion that, given the two versions of the memo in Teegardin's file, the memo was intentionally modified to omit the mention of union activity.

We need not consider CBC's due process argument, in which it contends that because the ALJ *sua sponte* found the June 22 warning to be a violation of the Act, CBC lacked notice of the alleged violation. CBC did not raise this argument in the exceptions to the ALJ's decision that it filed before the Board. Thus, this court lacks jurisdiction to consider this claim. *See* 29 U.S.C. § 160(e). In any case, "[i]t is well established that the Board may find a violation not alleged in the complaint if the matter is related to other violations alleged in the complaint, is fully and fairly litigated, and no prejudice to the respondent has been alleged or established." *Action Auto Stores Inc.*, 298 N.L.R.B. 875, 876 n.2 (1990), *enforced sub nom. NLRB v. Action Auto Stores, Inc.*, 951 F.2d 349 (6th Cir. 1991) (table decision). The ALJ noted that the June 22 warning was closely

connected with the June 26 warning and subsequent discharge, which were alleged as violations in the complaint.  Furthermore, any remaining prejudice was eliminated upon review by the Board, where CBC had the opportunity—of which it took advantage—to fully litigate the issue.

Accordingly, the Board's determination with respect to the June 22 disciplinary warning issued to Teegardin is supported by substantial evidence.

**2.**

Teegardin's June 26, 2002, written warning arose from a verbal altercation with employee Kevin Hassan on June 24, 2002.  The two men offered conflicting accounts of the incident, but, apparently, they called each other liars and exchanged challenges to fight.  Hassan reported the incident to CBC president James Appold and eventually signed and backdated a written statement about the incident.   On June 26, CBC issued Teegardin a written warning for using obscene and threatening language against Hassan; the warning also cites Wilson's June 22 warning to Teegardin regarding "harassment."

The ALJ found that the June 26 warning violated section 8(a)(3) and (1) of the Act, and we conclude that this determination is supported by substantial evidence.  First, as the ALJ noted, the June 26 warning was predicated in part on the unlawful June 22 warning, as Wilson admitted. Additionally, the ALJ reasonably concluded that CBC had treated Hassan much more leniently with respect to the incident; no warning was placed in Hassan's personnel file, and the ALJ rejected testimony from CBC that it had warned Hassan verbally.

The ALJ further noted that CBC did not ask Teegardin for his version of the incident. As CBC notes, the Board's decision criticized the ALJ for appearing to "impose a standard akin to due process" in faulting CBC for failing to thoroughly investigate various incidents. Even taking into consideration this criticism of the ALJ's analysis, however, substantial evidence still supports the ALJ's finding of discriminatory motive with respect to the June 26 warning. The ALJ's finding that Hassan was treated more leniently for his role in the altercation is supported by the record and, moreover, is grounded in part on the ALJ's credibility determinations, which this court may review only if they have "no rational basis," *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003). Such disparate treatment is circumstantial evidence of discriminatory motive. *See Gen. Fabrications Corp.*, 222 F.3d at 226. In addition, as noted above, the June 26 warning was based in part on the earlier unlawful warning issued to Teegardin on June 22. Thus, we conclude that substantial evidence supports the ALJ's determination.

**3.**

On August 26, 2002, managers Jack Johnson and Wilson terminated Teegardin, informing him that he was being fired for "sexually harassing" employee Donald Whitted and for failing to report a 1987 DUI conviction on his August 2000 employment application. The ALJ concluded, and the Board affirmed, that "[t]he evidence that CBC discharged Teegardin for discriminatory reasons is overwhelming." We agree.

The "sexual harassment" charge arose out of series of confrontations between Whitted and Teegardin. On August 7, 2002, Whitted attempted to provoke Teegardin, who was demonstrating outside the facility in support of the Union, by following him around with anti-union signs. In a

13

second confrontation the next day, Whitted again tried to provoke Teegardin. Teegardin subsequently complained to his supervisor, Herb Telford, who then reported the complaint to higher-level managers. CBC, however, did not investigate the incident.

On August 8, Teegardin was participating in a pro-union demonstration across the street from the plant's main entrance. When Whitted walked by the demonstrators, he yelled, "Waa, waa. Tell it to your mother." Either Teegardin or Leo Hacker, another pro-union employee, responded by yelling something about Whitted "sucking d**k." Whitted told Teegardin that he considered the remark to be sexual harassment, and he reported the incident to Teegardin's supervisor. CBC did not interview Teegardin or any witnesses known to be sympathetic to the Union about the incident. No disciplinary action was taken against Teegardin with respect to this incident until August 26, the day of his termination.

On the day of the representation election, August 15, human resources manager Jack Johnson called Scott Gregory, Teegardin's supervisor at a previous employer, Hisan, Inc. Gregory stated that Teegardin had never harassed anyone at Hisan. The next day, on August 16, Johnson spoke with two Hisan employees, who would not explain why Teegardin had been fired but "made it clear that it had nothing to do with sexual harassment."

Subsequently, on August 23, 2002, CBC president Appold initiated another background check on Teegardin. This search revealed that in 1987, Teegardin had been convicted of driving under the influence of alcohol, which he had not disclosed on his employment application. Also on August 23, Appold directed supervisor Donald Hager to monitor Teegardin's union activities, record them, and turn in his notes to Appold. Three days later, on August 26, Johnson and Wilson told

Teegardin he was being terminated for "sexually harassing" Whitted and for failing to report the DUI conviction.

The ALJ found that the following facts supported its conclusion that CBC discharged Teegardin for discriminatory reasons: (1) manager Dennis Babb admitted that Teegardin's discharge was based in part on the June notes in his personnel file, which related to protected activity; (2) CBC inadequately investigated Whitted's complaint; (3) CBC failed to proffer a credible nondiscriminatory reason for its background investigations of Teegardin; (3) the timing of the background checks was suspect, given that one was made on the day of the representation election, which was also the day that CBC decided to terminate Lawhorn, the other prominent union supporter; (4) Appold ordered surveillance of Teegardin's union activities on August 23, the day of the last background check, and Teegardin was fired three days later; (5) CBC disparately treated similarly situated employees who had been accused of falsifying employment applications and/or sexual harassment; and (6) as a matter of law, "sexual harassment" does not encompass a single obscene remark of the kind Teegardin allegedly made to Witted, and, moreover, CBC did not have a good-faith belief that sexual harassment encompassed such behavior. The Board adopted the ALJ's finding that CBC violated section 8(a)(3) of the Act when it discharged Teegardin. It noted, however, that much of the ALJ's disparate treatment analysis was not directly on point; the Board explained, "We find that [CBC's] disparate treatment of [Marvin] Hinton, as well as its conduct in

responding to Whitted's August 8 complaint about Teegardin while failing to investigate Teegardin's August 7 complaint about Whitted, are the most compelling examples of disparate treatment."[3]

The Board's finding is clearly supported by substantial evidence on the record. Numerous facts, as recited above, corroborate a finding of discriminatory motive and pretext with respect to the termination of Teegardin, and we, accordingly, decline to overturn this finding on appeal.

**B.**

William Lawhorn began working for CBC in April 1991 and remained employed by the company until his termination on August 16, 2002, the day following the representation election. In February 2002, Lawhorn began to assist in a union organizing drive (for a different union than the party to the instant case) by handing out authorization cards and union literature. Then, in March or April of 2002, Lawhorn contacted the Union regarding the possibility of organization. Lawhorn participated in the first day of union handbilling outside of the facility on May 21, 2002. CBC, accordingly, viewed Lawhorn as a leader in the union organizing campaign.

**1.**

The ALJ found, and the Board affirmed, that CBC violated section 8(a)(1) of the Act when, on August 10, 2002, supervisor Betty Gerren warned Lawhorn that if the Union did not win the

---

[3]Hinton, who was not a union activist, denied on his employment application that he had been convicted of any crime. CBC ran a background check two days after Hinton applied and found that Hinton had two convictions on his record. CBC hired Hinton nonetheless. Additionally, the company did not fire Hinton, who also had other disciplinary warnings, when he was accused of sexually harassing a coworker by putting his hand on the coworker's leg and saying, "I want to f*** you . . . I'm going to take you home. You're my bitch." CBC finally terminated Hinton after he was disciplined on several other occasions.

representation election, Lawhorn would be fired. On that day, Lawhorn was making pro-unionization signs with two other CBC employees when Gerren arrived at his house. Upon observing the signs, Gerren told him, "you know if the Union doesn't get voted in, you'll be fired." Gerren did not testify at the administrative hearing, and, consequently, the ALJ found that, in light of Lawhorn's unrebutted testimony, Gerren's comment violated the Act.

That Gerren may have made the comment in a friendly manner does not undermine the ALJ's determination. The relevant inquiry is whether "substantial evidence demonstrates that the employer's statements, considered from the employees' point of view, had a reasonable tendency to coerce." *Dayton Newspapers*, 402 F.3d at 659. Indeed, as this court has noted, "The mere existence of friendly relations between a supervisor and an employee does not preclude a finding that the supervisor employed coercion violative of the Act." *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 550 (6th Cir. 1984). Here, Gerren's threat of termination, viewed from the perspective of a reasonable employee, would tend to have a coercive effect. We thus conclude that the Board's determination with respect to Gerren's warning is supported by substantial evidence.

## 2.

Both the ALJ and the Board also determined that Lawhorn's August 16, 2002, termination violated the Act. We agree, as substantial evidence amply supports this conclusion.

On August 14, 2002, the day before the representation election, Lawhorn attended a preelection conference along with representatives from CBC, the Union, and the Board. A Union representative asked if he could see the election notices posted at the facility, and CBC manager

Johnson agreed that he could view the notice posted at the EZ Pack building. Johnson did not offer to escort the representative or give him directions to the building. Upon the representative's request, Lawhorn escorted him to the EZ Pack building. After purchasing hair nets, which were required in the facility's production area, from a security guard, Lawhorn led the representative on the most direct route to EZ Pack—through the CBC production area. After reviewing the notice, Lawhorn and the representative walked around the main building to the parking lot.

When the Union lost the representation election on August 15, Johnson, CBC president Appold, and CBC vice-president Larry Ivan had an impromptu meeting in which they discussed Lawhorn's escort of the Union representative through the plant. According to Ivan's testimony, on August 16, he informed Lawhorn that he was being fired for taking an unauthorized visitor through the plant and "electioneering." The "electioneering" charge supposedly derived from employee Terry Kreisher's report that Lawhorn taunted him by chanting "union time, union time" while escorting the Union representative through the production floor. The ALJ found, however, that CBC was unaware of any electioneering allegations at the time it made the decision to terminate Lawhorn. In support of this conclusion, the ALJ noted that: Kreisher's testimony regarding when he informed CBC of the allegation was largely uncorroborated; Johnson did not get a statement from Kreisher until one week after Lawhorn's discharge; and Ivan's notes of the August 16, 2002, meeting do not mention the Kreisher incident. The ALJ further found Ivan's testimony to be incredible. Finally, the ALJ concluded that the second page of Lawhorn's termination notice—the only page which mentioned electioneering—was fabricated sometime after Lawhorn's discharge.

18

The ALJ then found that Lawhorn's discharge was unlawful, as CBC's proffered reason for his termination was pretextual. This finding is supported by substantial evidence on the record. The ALJ reasonably inferred CBC's discriminatory motive from, *inter alia*, the following: the temporal proximity of Lawhorn's discharge to the representation election; Gerren's unlawful August 10 warning that Lawhorn would be fired if the Union lost the election; the failure of Ivan's August 16 meeting notes to mention the Kreisher incident; and CBC's tremendous hostility towards the Union. Additionally, the ALJ noted that the remaining reason for Lawhorn's discharge—his escort of an unaccompanied visitor through the plant—was also obviously pretextual, given that: CBC was well aware that the Union representative was walking inside the plant; CBC did not give any instructions on how to get to the EZ Pack facility; and Lawhorn and the representative took the shortest route to the facility. The Board's adoption of the ALJ's finding is supported by overwhelming evidence on the record. CBC's arguments to the contrary are wholly unpersuasive; CBC asks this court to overturn the ALJ's credibility determination with respect to Kreisher's testimony. But this court "severely limit[s] [its] review of credibility determinations and accept[s] those made by the Board unless they have no rational basis." *Fluor Daniel*, 332 F.3d at 967 (quotation marks omitted). Here, the ALJ provided an entirely rational basis for rejecting Kreisher's testimony, as described above.

Accordingly, we conclude that substantial evidence supports the Board's determination that CBC unlawfully discharged Lawhorn.

## C.

The Board affirmed the ALJ's finding that CBC violated section 8(a)(1) of the Act by telling Cheri Todd that she could not be a fill-in lead because of her union activity, as well as the ALJ's

determination that CBC violated 8(a)(3) when it denied Todd the fill-in lead position because of her union activity. On May 20, 2002, manager Dan Kear had informed Todd that there was a possibility that she would be given a position as a fill-in leadperson to cover for employees going on vacation. The next day, Kear observed Todd in front of the facility passing out union cards. Shortly thereafter, Kear, along with manager Chris Sherrick, called Todd into his office. By his own admission, Kear told Todd that she would not be given the job of fill-in lead as a result of her union activity the night before. As the ALJ explained, however, the fill-in lead position is not a supervisory position, and persons in this position are eligible to vote in a representation election.

CBC claims that no violation of the Act occurred because, according to Kear's testimony, Todd stated during their conversation that she "chose the Union instead of the lead position." CBC misses the point; Todd never should have had to make such a choice. Kear's statement provides direct evidence of CBC's unlawful motivation for the adverse employment action it took against Todd. *See Gen. Fabrications Corp.*, 222 F.3d at 226. CBC, moreover, has not even attempted to carry its burden of showing that it would have taken the same adverse action in the absence of Todd's union activity. *See id.* Thus, the Board's determination that CBC violated both section 8(a)(3) and section 8(a)(1) of the Act is clearly supported by substantial evidence.

**IV.**

In its brief, the Union contends that the Board erred in finding, contrary to the ALJ, that CBC lawfully discharged John Green, Gary Hill, Thomas Thompson, Tyrone Holly, and Patti Wickman. Both CBC and the Board, however, contend that this court lacks jurisdiction to review the issues presented in the Union's brief. Specifically, they argue that the Union, having never petitioned this

court for review of the Board's decision, is merely an intervenor and is therefore precluded from raising issues not argued by the Board or CBC.

This jurisdictional question arises from rather lengthy procedural history. On August 29, 2006, the Union filed a document captioned "Motion for Leave to Intervene" in this court. While the motion was styled as an intervention motion, the body of the motion also stated that the Union moved "to file a Petition for Review," and the memorandum attached to the motion stated that the Union "also seeks this Court's permission to appeal the Board's decision to dismiss the wrongful termination of the remaining five discriminatees." On September 25, 2006, the clerk granted the Union's motion, specifically referencing it as a "motion . . . to intervene."

The Union filed its brief on February 22, 2007, and, shortly thereafter, on March 2, 2007, the Board filed a motion to strike the Union's brief. In this motion, the Board argued that the Union's intervenor brief should have defended the Board's decision and order, but, instead, the brief sought to challenge portions of the Board's decision. Notably, the Board pointed out that the briefing schedule set up by this court was appropriate only if the intervening Union was defending the Board's decision; pursuant to the original briefing schedule, the CBC was to file an opening brief, the Board was to file a responsive brief, the Union was to file an intervenor brief simultaneously with the Board's brief, and CBC was to file a reply to the Board and intervenor's briefs. This briefing schedule did not provide the Board with an opportunity to respond the Union's arguments.

Following the Board's motion to strike, CBC also filed a similar motion, the Union filed a response, and the Board and CBC filed replies. The clerk then issued an order on October 11, 2007,

in which the Union's motion to intervene was "construed as a petition for review." The order permitted the Board and CBC to respond to the Union's brief by filing briefs in response. Additionally, the order referred to this panel the motions to strike; the order stated that this panel is to "determine whether the motion to intervene was sufficient to act as a petition for review and if it is not, whether the issue the [U]nion's brief raises as an intervenor is properly before this Court."

The Union contends that the motion to intervene was sufficient to act as a petition for review. Pursuant to the Act, "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order . . . . by filing . . . a written petition praying that the order of the Board be modified or set aside." 29 U.S.C. § 160(f). Additionally, according to Federal Rule of Appellate Procedure 15(a)(1), "[r]eview of an agency order is commenced by filing . . . a petition for review." This petition, moreover, must (1) name each party seeking review either in the caption or the body of the petition, (2) name the agency as a respondent, and (3) specify the order or part thereof to be reviewed. Fed. R. App. P. 15(a)(2).

For the most part, the motion to intervene satisfies the substantive requirements of § 160(f) and Rule 15(a); although the motion does not specifically "name the agency as a respondent," this is presumably implied. As noted above, the body of the motion to intervene stated that the Union also moved "to file a Petition for Review," and the memorandum attached to the motion stated that the Union "also seeks this Court's permission to appeal the Board's decision to dismiss the wrongful termination of the remaining five discriminatees."

It does appear that the motion was initially construed *only* as a motion to intervene by this court, as evidenced by the original briefing schedule, described above, which did not provide the

22

Board with an opportunity to respond to the Union's arguments. *Cf.* Fed. R. App. P. 15.1 ("In either an enforcement or a review proceeding, a party adverse to the National Labor Relations Board proceeds first on briefing . . . , unless the court orders otherwise."). The clerk, however, corrected this error when, in the October 11 order, the briefing schedule was reset to provide the Board and CBC with an opportunity to respond to the Union's brief. Indeed, the Board and CBC have now each submitted arguments in response to the Union's brief. Thus, given that the Board and CBC were ultimately not prejudiced by the original briefing schedule, we will construe the motion to intervene as a petition for review and, accordingly, deny the motions to strike. We now consider the terminations of John Green, Gary Hill, Thomas Thompson, Tyrone Holly, and Patti Wickman.

## A.

On September 6, 2002, John Green returned to work without medical restrictions following several months of medical leave and restricted work due to a knee and shoulder injury. Green asked his supervisor to assign him to a different machine so that he would not have to crawl under as much equipment, but the supervisor denied the request. That same day, Green asked to go home when his knee began to bother him; accordingly, his supervisor found a replacement for him and permitted him to leave early. On his next scheduled workday, September 9, Green called CBC and reported that he was not coming to work. He did not call in or report to work on September 10 or 11. On September 11, however, Green delivered a doctor's note to CBC's human resources office stating "seated work only until MRI of knee." On September 13, Green's doctor faxed CBC a copy of MRI results revealing a knee injury. Subsequently, Green neither reported to work nor called in at any

time thereafter; nor did CBC contact Green. On September 18, CBC terminated Green for failing to call in or report to work for three consecutive days, pursuant to its policy.

In finding that this termination violated section 8(a)(3) of the Act, the ALJ noted that CBC was aware that Green was a union supporter. The ALJ further surmised that CBC had acted with a discriminatory motive, based on the following facts: CBC harbored an extreme degree of anti-union animus; CBC did not follow its normal procedure with respect to physicians' notes, as it normally will call the employee to inform him whether work is available; and Green was disparately treated as compared to Kim Combs-Mason, an anti-union employee. The Board, on the other hand, concluded, "Even assuming that the General Counsel has met his initial burden . . . we find that [CBC] demonstrated that it would have terminated Green even in the absence of his protected activity."

Contrary to the Union's claim, the proper standard for evaluating the Board's determination with respect to Green's discharge is substantial evidence, not some "heightened standard of review." Indeed, we conclude that substantial evidence supports the Board's finding regarding the lawfulness of CBC's termination of Green. As the Board noted, CBC has a written attendance policy stating that termination will result if an employee fails to report or call in for three consecutive days. Moreover, the record does not clearly show that CBC had a policy of calling employees who submit physicians' notes, or that CBC had an obligation to contact Green. Furthermore, as the Board found, Combs-Mason—an employee not terminated after three consecutive absences—is not similarly situated to Green, as her absence was protected under the FLMA. Finally, contrary to the Union's assertion, the Board's decision did not overturn any of the ALJ's credibility determinations; the

Board simply assessed the same facts as the ALJ did and reached a different conclusion—one which commands this court's deference under the substantial evidence test. Thus, the Board's conclusion that CBC provided a legitimate, nondiscriminatory reason for its termination of Green is supported by substantial evidence.

**B.**

On December 26, 2002, Gary Hill and Thomas Thompson were working on the palletizer, a machine that must be run continuously. Hill and Thompson expected to be relieved thirty minutes before the end of their shift, but their replacement failed to report on time. Hill spoke with supervisor Kelly Frey by phone and informed her that he needed to shut down the palletizer, as he had an appointment after his shift, and Thompson had to catch a ride home with a coworker. Frey told Hill that either he or Thompson had to remain and run the palletizer. She also informed Hill that if they chose to leave they would be reprimanded. Nonetheless, Hill and Thompson shut down the palletizer and left. On January 3, 2003, CBC terminated Hill for insubordination and leaving work without permission, and the company terminated Thompson for receiving three warnings in a twelve-month period, including a written warning for leaving work without permission on December 26.

The ALJ found that CBC violated section 8(a)(3) of the Act in terminating Hill and Thompson, pro-union employees who had continued distributing union literature after the August

25

15 representation election. The ALJ inferred CBC's discriminatory motive from the following facts: CBC had demonstrated anti-union animus; the shutdown of the palletizer was only briefly harmful to production; and other employees with three warnings in a twelve-month period were not terminated. The Board, however, concluded that CBC had met its burden of proving that it would have terminated Hill and Thompson for legitimate reasons even in the absence of their protected activity.

The Board's decision is supported by substantial evidence on the record. As the Board noted, both Hill and Thompson did engage in the conduct of which each was accused, and, moreover, CBC's policies clearly permit termination for their conduct. The Board also pointed out that while some CBC employees were not discharged for receiving three warnings in a year or for insubordination, other employees were treated in a similar fashion as Hill and Thompson. The Board also found, contrary to the ALJ, that the difference in CBC's stated reasons for the discharge of each employee could be reasonably explained: Hill defied a direct order from Frey in shutting down the palletizer and leaving—thus meriting termination for insubordination—whereas Thompson failed to abide by an indirect order, from Frey via Hill, to remain at work. Contrary to the Union's repeated and unsubstantiated contention, the Board did not reject any of the ALJ's credibility determinations; again, as with Green's termination, the Board simply reached a different conclusion, based on the record, as to whether CBC had offered a legitimate reason for the discharge of Hill and Thompson. The Board's conclusion, accordingly, is supported by substantial evidence.

**C.**

On January 18, 2003, Tyrone Holly, a pro-union employee, wore a shirt with buttons to work at CBC, where he was serving as relief machine operator. CBC had been phasing out button shirts for the past two years, and, on June 10, 2002, following a serious incident of a consumer choking on a button, CBC sent a memo to all employees stating that, beginning on July 1, no CBC employees would be permitted to wear shirts with buttons to work. Employees were given instructions on how to obtain button-less uniforms. On January 18, supervisor Diane Tate saw Holly around 7:00 or 7:30 a.m. and told him that he could not wear the button shirt. Holly asked if he could go home, and Tate responded that he could not. When Tate saw Holly again at 10:00 a.m., he was still wearing the button shirt. She obtained him a shirt with snaps, rather than buttons, and told him to put it on. Later, however, she saw that Holly had put the snap shirt over the button shirt, leaving the buttons on the longer-sleeved button shirt still exposed. Tate told Holly to remove the button shirt, or he would be written up. When Tate saw Holly the fourth time, he had complied with her instructions. Tate placed a note in Holly's personnel file on that same day relating the incident. Holly was fired for insubordination on January 20, 2003.

The ALJ concluded that CBC had a discriminatory motive in discharging Holly. The ALJ noted that CBC discharged Holly without talking to him first and that "Holly was clearly not insubordinate." The ALJ also found that CBC had treated Holly more severely than other employees.

The Board, in contrast, concluded that, particularly in matters of safety, it would not substitute its own judgment for that of CBC, as the ALJ had done by "imposing his own subjective standard of insubordination." The Board further noted that the ALJ's emphasis on CBC's failure

to question Holly about the incident went too far; while it was permissible to use this as a factor in assessing discriminatory motivation, the ALJ was, in effect, imposing an unwarranted due-process-like requirement on CBC.

The Board's determination is supported by substantial evidence. Indeed, in a recent case, the Board upheld the discharge of an employee who did not immediately return to her workspace; in doing so, the Board noted:

> In passing the Act, Congress never intended to authorize the Board to question the reasonableness of any managerial decision nor to substitute its opinion for that of an employer in the management of a company or business, whether the decision of the employer is reasonable or unreasonable, too harsh or too lenient. The Board has no authority to sit in judgment on managerial decisions.

*Neptco, Inc.*, 346 N.L.R.B. 18, 20 n.16 (2005) (quoting *NLRB v. Florida Steel Corp.*, 586 F.2d 436, 444-45 (5th Cir. 1978)). Moreover, as the Board pointed out, the evidence that other employees had been terminated for insubordination diminishes the value of the contrary evidence of employees who were not treated as severely. Thus, the Board's determination that Holly's termination was lawful is supported by substantial evidence on the record.

## D.

On January 20, 2003, supervisor Theresa Schartzer received a complaint from leadperson Bertha Noriega regarding employee Patti Wickman. Noriega reported that several temporary Hispanic workers had told her that Wickman called them "f***ing bitches." Schartzer spoke with Wickman, who denied the allegations. Schartzer then told supervisor Dan Kear about the incident. Kear interviewed the three Hispanic employees using Noriega as an interpreter; the employees

related that Wickman had called them "f***ing bitches." Kear and supervisor Chris Sherrick then spoke with Wickman, who denied the allegations again. According to Wickman's testimony, Kear noted that Wickman had "been told about this before" but Wickman protested that she "didn't do it this time." Kear informed Wickman that she was being indefinitely suspended pending a decision to be made on her employment status. In a memo to human resources personnel, Kear recommended Wickman's termination, noting that "[t]his would not only send a strong message in regards to respect and dignity but would show support for our Staffing agencies and the Spanish speaking community." On January 21, human resources officer Jack Johnson informed Wickman that she had been terminated.

The ALJ determined that this termination was unlawful, finding that there was no reliable evidence that Wickman had called the employees "f***ing bitches" and that Wickman, an openly pro-union employee, was treated more harshly than other employees. The Board, assuming *arguendo* that the General Counsel had met its initial burden, concluded that CBC had demonstrated that it would have terminated Wickman even in the absence of her protected activity.

This decision is supported by substantial evidence on the record. First, as the Board noted, Wickman had previously been warned and disciplined for screaming and cursing at employees and managers on several occasions. The Board further explained that it did not agree that Kear's testimony was hearsay merely because it involved a language barrier and an interpreter. Indeed, in order to meet its burden of proof, "an employer need not prove that the employee committed the alleged offense." *McKesson Drug Co.*, 337 N.L.R.B. 935, 937 n.7 (2002). Rather, "the employer must show that it had a *reasonable belief* that the employee committed the offense, and that it acted

29

on that belief when it discharged him." *Id.* (emphasis added); *accord Int'l Union*, 514 F.3d at 585.

Thus, Kear's account of his investigation of the allegations against Wickman is sufficient to show

that CBC had a "reasonable belief" that Wickman had committed the offense—even if it was not

sufficient to prove that Wickman had actually committed the offense. That CBC had a "reasonable

belief" with respect to the veracity of the allegations is supported by Wickman's history of screaming

and cursing at other employees. And, as the Board pointed out, Kear's statement that CBC would

do well to send a message of respect regarding the treatment of its Spanish-speaking employees was

not unfounded; Wickman's own exit interview revealed her animosity toward Hispanic employees.

We therefore have ample reason to conclude that the Board's determination regarding Wickman's

discharge is supported by substantial evidence.

## V.

The Board summarily adopted the majority of the ALJ's findings with respect to the eighteen

section 8(a)(1) violations identified in the ALJ's decision. Specifically, the Board stated:

> We adopt the judge's findings that [CBC] violated Section 8(a)(1) through the following conduct: telling employees not to talk about the Union on company time; suggesting to employees that supporting the Union would be futile; instructing security guards to call police at the first sign of union activity and calling the police to the facility; telling Cheri Todd that she could not be a fill-in lead because of her union activity; threatening employees with loss of benefits, plant closure, and stricter discipline if they supported the Union; telling Cathy Hill that she could not distribute literature on company property; and telling William Lawhorn and other employees that Lawhorn would be fired if the Union lost the election.

CBC contends that none of these alleged violations are supported by substantial evidence.

As noted above, section 8(a)(1) of the Act makes it an unfair labor practice for an employer "'to interfere with, restrain, or coerce employees in the exercise of their rights' to organize, join, or assist unions, bargain collectively, and engage in collective action." *Dayton Newspapers*, 402 F.3d at 659 (quoting 29 U.S.C. § 158(a)(1)). An employer will be found to have violated section 8(a)(1) when "substantial evidence demonstrates that the employer's statements, considered from the employees' point of view, had a reasonable tendency to coerce." *Id.* (citations omitted). It is not necessary to show actual coercion. *Id.* (citation omitted).

## A.

The ALJ found, and the Board affirmed, that CBC unlawfully threatened that loss of employee benefits would result from unionization. "It is well settled that an employer violates § 8(a)(1) of the Act by threatening to withhold benefits . . . for engaging in union activities." *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 279 (6th Cir. 1999). Substantial evidence on the record supports the conclusion that CBC president James Appold and CBC supervisor Susan Henry made such threats, in violation of section 8(a)(1).

Two or three days before the representation election, CBC held seven or eight employee meetings at which Appold spoke and vice president Larry Ivan ran a slide projector. Nearly all of CBC's employees attended one of these meetings. Ivan testified that Appold told employees, "when you begin to bargain you start from zero, you don't start from where you're at and bargain. Forward, from that point you start with a clean slate." Tyrone Holly, an employee who attended one of the meetings, similarly testified that Appold discussed bargaining in the following manner: "[Appold said] [t]hat it's a give and take situation. That he ain't going to just give something and just give it

31

away.  Like he said that we got the turkeys, the ham, and our cookie box, and if the Union comes in there, a lot of that stuff we won't even have because they put it all on the table.  And he said that we won't get probably none of that after it's all over with."  Additionally, Holly testified that Appold showed pictures of vandalism at the facility and stated that union people had committed these acts of vandalism.  The ALJ credited the above-described testimony.

This court has acknowledged that "[a]n employer's statement that after unionization bargaining will begin 'from scratch' can be coercive, and therefore a violation of § 8(a)(1), depending on the context of the statement."  *Gen. Fabrications Corp.*, 222 F.3d at 231.  "Coercive statements are those which indicate that the employer will adopt a regressive bargaining stance or lowered benefits to penalize workers for unionization, and are viewed in the context of other statements or actions by the employer."  *Id.*   Here, Appold told employees that bargaining would start "from zero" and "with a clean slate."  These statements can reasonably be construed as coercive, given the context: in this same meeting, Appold suggested that other benefits would be lost, such as holiday hams and turkeys, and maligned the Union with allegations of violence and vandalism.  Although Appold did mention that bargaining is a "give and take situation," as the ALJ noted, his comment that employees would probably ultimately lose specific benefits negated this lawful aspect

of his speech.[4]  Accordingly, the ALJ's conclusion, affirmed by the Board, that Appold's comments

violated section 8(a)(1) of the Act is supported by substantial evidence.

The Board further found that Susan Henry violated section 8(a)(1) by, like Appold,

threatening employees with the loss of benefits.  During the union organizing drive, in the spring or

summer of 2002, Susan Henry, a line supervisor, approached a CBC employee distributing union

handbills in front of the facility.  Henry, by her own admission, stated that she inquired of the

employee, "[A]re you telling these people that they could lose their Christmas bonus[?]"

Considering this statement from an employee's point of view, this statement would seem to have a

"reasonable tendency to coerce" an employee, *see Dayton Newspapers*, 402 F.3d at 659, as it

suggests that bonuses would not be forthcoming in the event of unionization.[5]

For its part, CBC argues that Henry's statement is protected under section 8(c) of the Act,

29 U.S.C. § 158(c).  Although section 8(c) permits an employer to communicate non-threatening

predictions about the consequences of unionization, such  predictions "must be carefully phrased on

the basis of objective fact to convey an employer's belief as to demonstrably probable consequences

---

[4]CBC urges this court to overturn the ALJ's credibility determination with respect to Holly's testimony.  We have limited ability to review such credibility determinations and may only overturn those that have "no rational basis." *Fluor Daniel*, 332 F.3d at 967.  CBC's intimation that employees like Holly cannot understand the "subtle, practiced statements of informed and sophisticated agents of management" hardly provides a reasoned basis for questioning Holly's credibility.  The ALJ's decision to credit Holly's testimony was obviously rational, as Holly's account of the Appold meeting largely squared with the testimony of Ivan.

[5]As CBC points out, the person to whom Henry's question was addressed, Shirley Kelley, was actually a *retired* employee, not a current employee. Given, however, that this statement was apparently made within earshot of a current employee, Teegardin, Kelley's status as a retired employee is irrelevant.

beyond his control." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969); *accord Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1298-99 (6th Cir. 1988). The record is devoid of any suggestion that Henry's statement regarding the loss of Christmas bonuses had any objective factual basis.

Likewise, CBC's related argument—that Henry's use of the conditional "could" rather than an unconditional "would" renders the statement lawful—is untenable. First, this "could"/"would" distinction appears to have been rejected by the Board. *See Med. Ctr. of Ocean County*, 315 N.L.R.B. 1150, 1154 (1994). In *Medical Center*, the Board adopted the ALJ's finding that a supervisor's statement to an employee that he "could lose [his] benefits" was an unlawful threat in violation of section 8(a)(1), where, *inter alia*, there was no "suggestion that the loss of benefits which 'could' result was to be derived from negotiations in the give-and-take of collective bargaining." *Id.* In the instant case, Henry made no such suggestion. Moreover, as the Fifth Circuit has noted in response to a similar argument, ultimately, "the permissibility of [the company's] predictions necessarily turns on whether they were based on objective fact and adequately conveyed probable consequences beyond the [c]ompany's control," *not* on whether the predictions spoke of "possibility" rather than "probability." *Tellepsen Pipeline Servs. v. NLRB*, 320 F.3d 554, 563 (5th Cir. 2003) (implicitly rejecting *CPP Pinkerton*, 309 N.L.R.B. 723 (1992), a case heavily relied upon by CBC). Thus, the Board's conclusion that Henry's comment violated the Act is supported by substantial evidence.

## B.

Additionally, the Board adopted the ALJ's determination that supervisors James Keller and Dennis Herod unlawfully threatened plant closure in the event of unionization. It is well established

that threats of plant closure, being "among the most flagrant of unfair labor practices," violate section 8(a)(1) of the Act. *Indiana Cal-Pro*, 863 F.2d at 1301 (citation and quotation marks omitted); *see also V & S ProGalv*, 168 F.3d at 279.

According to Teegardin's testimony, in June 2002, he witnessed a meeting being held by Keller, a mechanic's supervisor, during which Keller informed five mechanics that the Union was going to cause CBC to lose contracts with Nabisco and force the company into bankruptcy. Teegardin further reported that, on a regular basis in June 2002, Keller would "holler" in the production area that the Union would cause the plant to lose contracts and close. When CBC called Keller as a witness, Keller was asked a series of leading questions, to which he gave yes or no answers, suggesting that Teegardin's testimony was false. Noting that the leading nature of Keller's questioning allowed Keller to avoid directly addressing Teegardin's testimony, the ALJ chose to credit Teegardin. Notwithstanding CBC's assertions otherwise, the ALJ gave a reasonable explanation for crediting Teegardin rather than Keller. A perusal of Keller's testimony transcript indicates that CBC asked Keller carefully crafted questions that allowed him to avoid addressing the incident Teegardin observed. In light of the strict limitations imposed on appellate courts reviewing agency credibility determinations, *see Fluor Daniel*, 332 F.3d at 967, CBC's argument that ALJ erred in crediting Teegardin is unpersuasive.[6]

---

[6]CBC also briefly asserts, citing no authority, that "Keller's statement amounted to nothing more than his opinion about the consequences of unionization." Again, as discussed above, while an employer may make predictions about the effects of unionization, such predictions "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel Packing Co.*, 395 U.S. at 618. Keller's opinions do not fall within the permissible category of "carefully phrased" predictions.

Two weeks before the representation election, according to Thomas Thompson's testimony, manager Dennis Herod  initiated a conversation about unionization with Thompson.  Herod stated that Appold might start moving production lines out of the McComb facility to his other facilities if the employees unionized.  The ALJ found, and the Board affirmed, that Herod's threat/prediction of moving production lines out of the facility constituted a violation of section 8(a)(1).  The ALJ noted that he credited Thompson rather than Herod who, in response to carefully crafted leading questions about the incident, responded that he "didn't recall" telling Thompson that the production lines might be moved.  Moreover, as the ALJ pointed out, Herod's testimony was inconsistent: he first stated that he did remember the discussion with Thompson about unionization, but then subsequently stated that he did not recall discussing unionization with Thompson at the time.  The ALJ's decision to credit Thompson was reasonable, and, accordingly, this court must defer to the Board's adoption of the ALJ's credibility determination.

CBC's attempt to classify this discussion as "nothing more than the free flow of conversation between a supervisor and an employee," is unpersuasive.  As an initial matter, this court has "found that even when [ ] a threat [of plant closure] is made in a seemingly lighthearted fashion, it still rises to the level of coercive because, in reality, threatening comments are often couched in ostensibly friendly or even humorous terms." *V & S ProGalv*, 168 F.3d at 279.  In any case, there is nothing in the record even suggesting that Herod's comment was made in a friendly or lighthearted manner.  We therefore conclude that substantial evidence supported the Board's finding of a section 8(a)(1) violation with respect to Herod's comment.

**C.**

The threat of stricter discipline in the event of unionization constitutes a violation of section 8(a)(1) of the Act. *See Gen. Fabrications Corp.*, 222 F.3d at 231. On June 7, 2002, supervisor Betty Gerren told three employees who were discussing the Union in the breakroom, "You'd better watch what you're doing. They're going to get tougher on you. If you get a Union in here, they'll be watching you." Thus, the ALJ found, and the Board agreed, that CBC violated the Act via Gerren's comment. CBC's only defense to this determination is that Gerren's comment was "too ambiguous" to constitute a threat. The case law cited by CBC, however, is not factually analogous to the present situation. *See Pease Co. v. NLRB*, 666 F.2d 1044, 1048 (6th Cir. 1981) (finding supervisor's statement that "in a couple more months he would not have to hear any grievances" was "trivial and ambiguous" where there was "no background of antiunion animus by [the] employer"). Indeed, as the Board notes, courts have found that words similar to those used by Gerren constituted threats. *See NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923, 920 (5th Cir. 1993) (concluding that statement that "things were going to get a lot tougher around here" upon unionization constituted a threat). Given the very clear meaning of Gerren's uncontested statement, we conclude that the Board's determination of its unlawfulness is supported by substantial evidence.

**D.**

An employer violates section 8(a)(1) of the Act when employees are threatened with the futility of unionization. *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 527-28 (6th Cir. 1984) (per curiam). In April or May 2002, according to Tyrone Holly's testimony, supervisor Diane Tate told him that the Union would not change anything at CBC and that companies doing business with CBC would not do so any longer. The ALJ credited Holly's uncontradicted testimony and,

accordingly, concluded that Tate's comment violated the Act by conveying to Holly that supporting

the Union would be futile. As it argued below, CBC suggests on appeal that Tate's comment was

protected under section 8(c) of the Act. As previously explained, however, section 8(c) protection

extends only when an employer's predictions are "carefully phrased on the basis of objective fact

to convey an employer's belief as to demonstrably probable consequences beyond his control."

*Gissel Packing Co.*, 395 U.S. at 618. Holly's credited and uncontradicted testimony fails to reveal

any such objective fact upon which Tate's remarks might have been based, and, accordingly, the

Board's conclusion that Tate's statements violated the Act is supported by substantial evidence.

**E.**

The ALJ found, and the Board affirmed, that CBC unlawfully prohibited employees from

discussing the Union on company time. Where an employer permits the discussion of non-work-

related topics on company time, the prohibition of discussion regarding union-related matters on

company time constitutes a section 8(a)(1) violation. *See Brandeis Mach. & Supply Co. v . NLRB*,

412 F.3d 822, 833 (7th Cir. 2005); *Jensen Enters., Inc.*, 339 N.L.R.B. 877, 878 (2003). Holly

testified that, in the spring of 2002, supervisor Gary Birkemeyer called Holly into his office and

informed him, in the presence of supervisor Denis Herod, that he "wasn't supposed to talk about the

Union on Company time." Birkemeyer also stated that other employees said that Holly was

harassing them about the Union. The ALJ credited Holly's testimony, as it was not contradicted by

Birkemeyer. Given that CBC does not dispute that it permitted employees to discuss non-work-

related topics on company time, Holly's credited testimony provides substantial evidence supporting

the Board's finding that CBC violated the Act by prohibiting employees from discussing the Union on company time.

**F.**

The ALJ found, and the Board agreed, that CBC violated section 8(a)(1) of the Act when it instructed security guards to call the police at the first sign of union activity and by actually calling the police to the facility. Threatening to call the police—and, of course, actually calling them—to interfere with lawful union activity constitutes a violation of the Act. *Cumberland Farms, Inc. v. NLRB*, 984 F.2d 556, 559 (1st Cir. 1993); *see also Wal-Mart Stores, Inc. v. NLRB*, 136 F. App'x 752, 752-53 (6th Cir. 2005). On May 21, 2002—the first day that the Union and its supporters began distributing literature in front of the CBC plant—a police officer arrived about ten minutes after the handbilling activity commenced. Initially, the police officer went inside the plant. Upon emerging from the facility, the police officer told the Union supporters and a Union representative that they were violating CBC's no-solicitation rule. The Union representative replied that they were not soliciting, but merely trying to organize a union. After speaking to CBC supervisors inside the facility, the police officer then essentially told them they could continue their activities.

Manager Douglas Benjamin testified that he spoke with the security guard who had called the police. The security guard told Benjamin that he had been instructed by his boss to call the police if there was any sign of union activity. Mark Wurgess, the security chief, testified that he told his staff, "if there was a problem with trespassers then Macomb PD would be the appropriate people to call, or if there was any type of incident or safety matter of any [] concern on the street that would effect [sic] the health and welfare of any people out there . . . but not for union activity, absolutely

not." The ALJ credited Benjamin's testimony and discredited that of Wurgess, for a number of reasons. The ALJ noted that CBC should have done more to rebut the guard's admission to Benjamin, such as putting some of Wurgess's subordinates on the stand. Additionally, the ALJ noted that nothing occurred on May 21, other than basic union handbilling across the street from the facility, that would prompt a guard to call the police—*i.e.*, there was no "health or safety" incident.

This incident, considered from the employees' point of view, could be deemed to have had a "reasonable tendency to coerce," *Dayton Newspapers*, 402 F.3d at 659. Within ten minutes of the employees' first attempt at distributing union literature, a policeman arrived on the scene and informed them that they were violating CBC's no-solicitation policy; surely such an incident smacks of coercion and anti-union hostility. CBC, however, asks the court to disregard the ALJ's decision to credit the double-hearsay of Benjamin over Wurgess's direct testimony that he never issued such an instruction. Because an ALJ is "not obliged to strictly adhere to the Federal Rules of Evidence," *Conley*, 520 F.3d at 640, the mere fact that the ALJ may have relied upon hearsay testimony would not automatically render his decision unreasonable. Regardless, as the Board notes, this challenge to the ALJ's credibility determination is likely barred by section 10(e) of the Act, 29 U.S.C. § 160(e), as CBC did not make this hearsay-based credibility argument in its exceptions before the Board.

We thus conclude, on the basis of the credited testimony of Benjamin, that substantial evidence supports the Board's finding that CBC violated the Act by calling the police at the first sign of union activity.

**G.**

On June 14, 2002, a CBC security guard told Cathy Hill, who was distributing union literature outside of the facility, that she could not disseminate this material on CBC property. The ALJ found, and the Board agreed, that this discriminatory warning regarding union handbilling was a violation of section 8(a)(1) of the Act. While CBC does not dispute that such a warning generally violates the Act, *see generally United Parcel Serv., Inc. v. NLRB*, 228 F.3d 772 (6th Cir. 2000), it contends that this was an isolated incident and therefore should be deemed a *de minimis* violation of the act. As the Board pointed out, however, it seems difficult to view this violation of the Act as *de minimis* when considered in the context of CBC's numerous other violations of the Act. Thus, we conclude that the Board's decision is supported by substantial evidence.

## H.

On or prior to June 27, 2002, manager Richard Quinn approached Hill and Thompson and informed them that he had received multiple complaints about them harassing people about the Union. Quinn testified that a line supervisor, whose name he could not remember, had received a complaint from an employee, whose name he also could not recall. Quinn then placed nearly identical notes about this conversation in Hill's and Thompson's personnel files. These notes, about which neither Hill nor Thompson were informed, stated that the men were soliciting employees on company time and "any further complaints received will result in disciplinary action." Both the verbal warning and the notes, the ALJ found, constituted restraint and coercion of Hill's and Thompson's section 7 rights in violation of section 8(a)(1) of the Act. This determination is supported by substantial evidence, as the verbal warnings and the notes would have a "reasonable tendency to coerce," *see Dayton Newspapers*, 402 F.3d at 659.

41

CBC agues that the Board did not adopt the ALJ's finding with respect to the June 27, 2002, warnings. We disagree. While the decision itself does not address the warnings, the Board's order states that CBC must "remove from its files any references to the unlawful disciplinary warnings issued to . . . Gary Hill on June 27, 2002; and Thomas Thompson on June 27, 2002; and within 3 days notify each employee in writing that this has been done and that the discipline will not be used against them in any way." Likewise, Member Walsh, in his dissent, states that "the majority finds that [CBC] unlawfully issued disciplinary warnings to . . . Thomas Thompson [] and Gary Hill[.]" As such, we conclude that the Board did, in fact, adopt the ALJ's finding with respect to the Hill and Thompson warnings and, furthermore, this finding is supported by substantial evidence.

## VI.

Finally, CBC contends that the Board erred in issuing a broad remedial order, as well as in ordering a new representation election. This court clearly lacks jurisdiction over the Board's order requiring that a new election be held. "An order setting aside elections is not ripe for our review until subsequent elections are held, even when that order is consolidated with other questions that are immediately appealable." *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1124-25 (6th Cir. 1997) (citing *United States Elec. Motors v. NLRB*, 722 F.2d 315, 320 (6th Cir. 1983) (per curiam)). In order to obtain review, an employer must instead "refuse to recognize a subsequent, Board-ordered election on the grounds that the election was improper." *Id.* at 1125.

Additionally, this court lacks jurisdiction to consider whether the Board's issuance of a broad cease-and-desist order was appropriate. Section 10(e) of the Act precludes this court from considering any issue not raised in the original proceeding before the Board, absent extraordinary

circumstances. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its

member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such

objection shall be excused because of extraordinary circumstances."); *see also Lee v. NLRB*, 325

F.3d 749, 752 (6th Cir. 2003). CBC claims that it could not have objected to the issuance of a broad

cease-and-desist order before the Board because the ALJ never recommended such an order. This

assertion is patently inaccurate. In the remedy portion of his decision, the ALJ stated:

> Because of [CBC's] egregious and widespread misconduct, demonstrating a general disregard for the employees' fundamental rights, I find it necessary to issue a broad Order requiring [CBC] to cease and desist from infringing in any other manner on the rights guaranteed employees by Section 7 of the Act. *Hickmott Foods*, 242 NLRB 1357 (1979).

The recommended order itself is also clearly a broad cease-and-desist order; it states that CBC shall

cease-and-desist from, *inter alia*, "In any other manner interfering with, restraining, or coercing

employees in the exercise of the rights guaranteed them by Section 7 of the Act." This language is

almost identical to that identified as a "broad order" in *Hickmott Foods*, 242 N.L.R.B. 1357, 1357

(1979). Thus, CBC was clearly on notice that the ALJ had recommended a broad order and, had it

wished to do so, it could have excepted to the issuance of a broad order. Moreover, the Board's

decision itself belies CBC's argument. The Board explained, "Chairman Battista and Member

Walsh adopt the judge's recommended broad cease-and-desist order, to which no exceptions were

filed." Accordingly, it is apparent that CBC could have excepted to the broad cease-and-desist order

recommended by the ALJ, but chose not to do so. We thus lack jurisdiction to consider this

argument.

**VII.**

For the foregoing reasons, we enforce the Board's order in its entirety. Furthermore, we deny the motions to strike the Union's brief.

**Lawrence P. Zatkoff, District Judge**, **concurring**. I write separately because, although I concur in the ultimate result, I respectfully disagree with the majority's findings regarding four of the alleged violations of section 8(a)(1).

First, the ALJ and the Board determined that CBC president James Appold made inappropriate comments in violation of section 8(a)(1). Appold told employees that "when you begin to bargain you start from zero, you don't start from where you're at and bargain. Forward, from that point you start with a clean slate." One of Appold's employees, Tyrone Holly, explained that Appold described the situation as one of "give and take" and further indicated that previously enjoyed perks such as turkeys, hams, and the cookie box would probably disappear. Appold also allegedly showed employees pictures of vandalism at the facility and attributed the vandalism to union supporters. The ALJ discredited much of Holly's testimony because it was directly contradicted by another employee. Holly's statements relaying Appold's comments on the bargaining process, however, were found to be credible because, according to the ALJ, those statements were not "directly" contradicted by another employee.

The lawfulness of statements regarding the nature of the bargaining process depends on the context in which they are made. *Somerset Welding & Steel, Inc.*, 314 N.L.R.B. 829, 832 (1994). Employers may not make statements "in a coercive context or in a manner designed to convey to employees a threat that they will be deprived of existing benefits if they vote for the union." *Id.* Employers may otherwise state their "side of the case" against unionization. *Id.* The propriety of employer statements often teeters on a fine line, especially when considering the variety of subjective interpretations that any given statement might evoke. Stating that bargaining will start from scratch,

45

in and of itself, does not render an employer's comments improper.  In this case, the ALJ determined that Appold's comments were coercive and improper based largely on the testimony of an individual whom the ALJ discredited on other matters because his testimony was directly contradicted.  Despite Holly's incredibility on other matters,  the portion of his testimony regarding Appold's comments was not discredited because it was not "directly" contradicted.  Although the majority makes a strong case for affirming the ALJ and the Board, I would hold that this alleged violation is not supported by substantial evidence.

Second, the ALJ and the Board found that Susan Henry made inappropriate comments in violation of section 8(a)(1).  Henry, a line supervisor, asked a pro-union employee: "[A]re you telling these people that they could lose their Christmas bonus[?]"  The majority observes that "[c]onsidering this statement from an employee's point of view, this statement would seem to have a 'reasonable tendency to coerce' an employee."  Although the employee to whom Henry spoke was retired, the majority's position is bolstered by the fact that the "statement was apparently made within earshot of a current employee."

As with any election, each side must have the opportunity to argue its position and observe the shortcomings of its opponents.  In the context of union elections, employers have a right "to point out . . . the adverse consequences of unionization."  *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir. 1983).  Here, Henry asked a retired pro-union employee about a potential outcome of the union election.  When employment bargaining begins anew, as it does when a union is elected, any number of possibilities may result, including the loss of certain benefits as well as the gain of certain other benefits.  Despite the guidance of related decisions for employers to frame their statements

carefully to avoid coercion, the legitimacy of drawing a "could/would" distinction for employer speech is unclear. The majority interprets *Medical Center of Ocean County*, 315 N.L.R.B. 1150, 1154 (1994), as eliminating the impact of the could/would distinction. The *Medical Center* opinion involved a number of circumstances that led to the Board's decision, including that the conversation at issue occurred "in the presence of a one-on-one conversation behind closed doors at the summons and instance of the supervisor, and in the absence of any suggestion that the loss of benefits which 'could' result was to be derived from negotiations in the give-and-take of collective bargaining." *Id.* The *Medical Center* decision also involved the supervisor's comment that employees could lose "just about everything." I am of the opinion that the underlying circumstances of *Medical Center* differ from those present in this case and do not give rise to a blanket abandonment of the "could / would" distinction. Without more, I would hold that Henry's comments are permissible and do not constitute a violation of section 8(a)(1).

Third, the ALJ and the Board concluded that supervisor James Keller unlawfully threatened plant closure in the event of unionization. This finding rests almost entirely on the observation that "CBC asked Keller carefully crafted questions that allowed him to avoid addressing the incident."

Although strict limitations govern appellate court review of agency credibility determinations, the agency's credibility determinations must have a rational basis. *See, e.g.*, *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003). Leading questions have occasionally been considered in credibility determinations, but they generally operate as enhancing factors to other evidence supporting incredibility. *See, e.g.*, *NLRB v. Tecmec, Inc.*, No. 92-5550, 1993 U.S. App. LEXIS, at *15–16 (6th Cir. Apr. 5, 1993) ("[T]he ALJ discussed the 'leading questions' at the end

of his analysis as a consideration 'in addition to [other] circumstances.'"). Our legal proceedings afford the opportunity for cross-examination in order to illuminate facts and witness credibility. Given the credence afforded agency credibility determinations, I understand the majority's position. In the absence of other incredible evidence, however, I am hesitant to affirm a finding that a witness is incredible based solely on the nature of the questions posed.

Finally, the ALJ and the Board determined that Betty Gerren made inappropriate comments in violation of section 8(a)(1). Gerren, a supervisor, told employees who were discussing the union: "You'd better watch what you're doing. They're going to get tougher on you. If you get a Union in here, they'll be watching you." The "very clear meaning" of Gerren's words, according to the majority, is threatening in nature.

As observed by the majority, courts have found that "words similar to those used by Gerren constituted threats." *See, e.g.*, *NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923 (5th Cir. 1993). The *McCullough* court, however, found that "[s]ubstantial evidence supports the NLRB's findings that McCullough violated § 8(a)(1) *by threatening its employees with economic reprisals for their union activities.*" *Id.* at 930 (emphasis added). Here, Gerren made no threats of economic reprisal. Although her statements may be construed as warnings of increased discipline, they lack specificity. It occurs to me that a difference exists between the statement that "[t]hey're going to get tougher on you" and the statement that "all privileges would be cut out." *See id.* Although the majority's interpretation of related case law is a reasonable one, I believe that Gerren's comments in this instance are too broad to be considered threatening and should not be considered a violation of section 8(a)(1).

Employer and employee behavior conducted in the midst of union elections falls under a cautionary lens. But it must be considered that elections of any nature require open advocacy for all parties. In the union-election context, threatening words and actions must not be tolerated; yet, their prohibition must not be so expansive as to limit the ability of an employer to state its case against unionization. The foregoing instances highlight the difficult nature of cases such as these. Because of the difficulties that arise in distinguishing threat from prediction and possibility, I would hold that unless clearly and explicitly constituting a threat of reprisal, an employer's words regarding a union election do not violate the Act.